DAVID DELAN, by His Guardian ad Litem, ELAINE DELAN, Respondent, v CBS, INC., et al., Appellants.

Second Department, January 24, 1983

APPEARANCES OF COUNSEL

*Coudert Brothers (Carleton G. Eldridge, Jr., Pamela G. Ostrager, Diane E. Rowley* and *Ronald E. Guttman* of counsel), for appellants.

*Vincent P. Di Stephan* for respondents.

*Alfred L. Schwartz (Muriel Henle Reis* of counsel), for Metromedia, Inc., and *Patricia J. Murphy* for American Broadcasting Companies, Inc., *amici curiae* (one brief).

*Irwin Karp* for the Authors League of America, Inc., *amicus curiae.*

*Jay E. Gerber* and *Barbara Gordon Hering* for National Broadcasting Company, Inc., *amicus curiae.*

*Steven R. Shapiro* and *Diana Tanaka* for the New York Civil Liberties Union, *amicus curiae.*

*Stuart W. Gold, Philip A. Byler* and *Cravath, Swaine & Moore* (*Harry M. Johnston* and *June A. Eichbaum* of counsel), for Time Incorporated, *amicus curiae.*

## OPINION OF THE COURT

BRACKEN, J.

May a mentally disabled patient in a State mental hospital, whose picture appears for approximately four seconds in a 60-minute telecast of a nonfictitious news documentary about the effects of, and alternatives to, institutionalization in mental hospitals, maintain a cause of action under the New York "right of privacy" statute (Civil Rights Law, §§ 50, 51)?*

Defendants are the producers of a documentary film entitled "Anyplace But Here", dealing with the program of reintroducing mentally disabled patients from hospital care to the general community. In the course of the documentary, edited for a one-hour telecast, one of the central figures, identified only as Elaine, is filmed at Creedmoor Psychiatric Center. At one point Elaine addresses plaintiff as David, says goodbye, and kisses him. Plaintiff never speaks and appears on camera for approximately four seconds. The documentary was televised on December 26, 1978, with occasional interruption for commercial messages. Defendant CBS also entered into a limited license agreement with Carousel Films for distribution of the film

---

* Section 50 of the Civil Rights Law provides: "A person, firm or corporation that uses for *advertising purposes, or for the purposes of trade,* the *name,* portrait *or picture* of any living person *without* having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor" (emphasis supplied).

Section 51 of the Civil Rights Law provides in relevant part: "Any person whose name, portrait or picture is used within this state for *advertising purposes or for the purposes of trade without the written consent* first obtained as above provided may *maintain an equitable action* in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, *to prevent and restrain the use thereof; and may also sue and recover damages* for any injuries sustained by reason of such use * * * But nothing contained in this article shall be so construed as to prevent any person, firm or corporation, practicing the profession of photography, from exhibiting * * * specimens of the work of such establishment, unless the same is continued by such person, firm or corporation after written notice objecting thereto has been given by the person portrayed" (emphasis supplied).

prints for nontheatrical exhibition, with no admission fee, to civic, medical or educational organizations.

In January, 1978, CBS embarked upon a project to produce a news documentary concerning the effects of the shift to deinstitutionalization of mental patients. Creedmoor Psychiatric Center, and in particular its Queens Central Unit, was ultimately selected as a target for study because it provided a patient body most representative of the community at large. Creedmoor's director, Dr. Werner, granted CBS permission to film and interview in the unit, on condition that CBS secure the consent of Dr. Fromm, the unit supervisor, and his patients. Fromm in turn granted permission subject to the consent of the patients. To ascertain their consent, Fromm held a "therapeutic community meeting" with the patients "who had been determined to have the capacity to make a reasoned decision as to whether they wanted to consent to participate in the program." The patients were told of the nature of CBS's planned documentary and that participation was optional.

After this meeting, representatives of CBS met with Dr. Fromm and the patients to explain the purpose of the program and the nature of the patients' participation. The CBS representatives explained to the patients that it was their view that large hospitals were not the best facilities for treating mental illness and that they were interested in the way Creedmoor was attempting to cope with the problem through programs designed to reintroduce the patients of the hospital to the general community. The CBS representatives told the patients that it was their intention not to interfere with the patients' daily activities and they explained that they wanted to show how some people were dealing with a common and important national problem so that the public could have a better understanding of the problem. It was during this meeting that Dr. Fromm told the patients that they could participate only if they signed consent forms. Only those patients who expressed willingness to participate and signed hospital consent forms were to be interviewed and filmed.

Plaintiff David Delan was one of the patients in the unit who Dr. Fromm had determined was capable of consenting to participate in the documentary. David Delan was pre-

sent at the explanation of the project by representatives of CBS and he thereafter signed a form entitled "CONSENT FOR PATIENT INTERVIEW" on May 12, 1978, with space left blank for the signature of the witness and the printed name of such witness.

In granting summary judgment to plaintiff on his second cause of action, Special Term held (111 Misc 2d 928) that the inclusion of commercial messages in the initial telecast, and the subsequent licensing for distribution of the film of the documentary, amounted to use of plaintiff's name and image for trade and advertising within the meaning of section 51 of the Civil Rights Law. The court also found that while plaintiff had signed a consent form, that consent was invalid for, *inter alia,* lack of capacity (cf. 14 NYCRR 22.3 [when patient may sign legal instrument], 82.8 [records and statistics]). We reverse.

At common law, a cause of action for violation of the right of privacy is not cognizable in this State (*Roberson v Rochester Folding Box Co.,* 171 NY 538), and exists solely by virtue of the statutory provisions of sections 50 and 51 of the Civil Rights Law (*Cohen v Hallmark Cards,* 45 NY2d 493, on remand 70 AD2d 509; *Wojtowicz v Delacorte Press,* 43 NY2d 858; *Gautier v Pro-Football,* 304 NY 354). Because of the beneficial and remedial purposes of sections 50 and 51, a liberal construction to accord with such purposes has been given to the statutory language of those provisions (*Spahn v Julian Messner, Inc.,* 18 NY2d 324, on rearg 21 NY2d 124, app dsmd 393 US 1046). Such construction, however, is necessarily subject to constitutional limitations and accordingly the sections in question must be accorded an interpretation which avoids constitutional infirmities (*Spahn v Julian Messner, Inc.,* 21 NY2d 124, *supra*).

The fact that defendants used the person of the plaintiff in their documentary film does not, in and of itself, make the use in question one for advertising or trade purposes within the scope of the statutory provisions.

"[A]dvertising purposes", as a concept, is separate and distinct from "purposes of trade" (*Flores v Mosler Safe Co.,* 7 NY2d 276). It requires a use in, or as part of, an advertisement or solicitation for patronage (*Flores v Mos-*

ler Safe Co., supra, p 284; *Lahiri v Daily Mirror,* 162 Misc 776). The fact that a telecast is commercially sponsored does not make such telecast one for advertising purposes if there is no connection between the performance and the commercial (*Gautier v Pro-Football,* 304 NY 354, *supra*). In this case, there is clearly no such connection and that part of the statute which proscribes such use for advertising purposes was not violated.

While the very term "purposes of trade" encompasses use for the purpose of making profit (since most publications perforce are profit making and the subject matter of such publications are designed with a view to being profitable), a literal construction of the statutory provision would violate the constitutional protection of free speech and free press when such publication involves a matter of public interest (*Time, Inc. v Hill,* 385 US 374; *Koussevitzky v Allen, Towne & Heath,* 188 Misc 479, affd 272 App Div 759). The reporting of matters of public information or of legitimate public interest, therefore, is a matter of privilege and not within the ambit of the term "purposes of trade" as used in the Civil Rights Law (*Arrington v New York Times Co.,* 55 NY2d 433; *Murray v New York Mag. Co.,* 27 NY2d 406; see *Time, Inc. v Hill, supra*), notwithstanding the inclusion of commercials (*Gautier v Pro-Football,* 304 NY 354, *supra*). Such matters of public interest enjoying this constitutional protection include not only current news items, both informative and entertaining (*Time, Inc. v Hill, supra; Gautier v Pro-Football, supra; Pagan v New York Herald Tribune,* 32 AD2d 341, affd 26 NY2d 941), but also such items which, although not strictly news, are designed to be informative (*Murray v New York Mag. Co., supra*).

In our opinion, the documentary film with which this case is concerned dealt with a matter of legitimate public interest, i.e., the deinstitutionalization of mental patients and their placement in an outpatient program designed to benefit both themselves and society as a whole. It involved a critical review of the mental hygiene program in this State as a matter of general and public concern, and the telecast, therefore, was clearly a privileged subject.

Of course, there must have existed a legitimate connection between the use of plaintiff's name and picture and the matter of public interest sought to be portrayed (*Murray v New York Mag. Co.,* 27 NY2d 406, *supra; Bass v Straight Arrow Publishers,* 59 AD2d 684), and the plaintiff must not have been singled out merely because he was part of the over-all scene (*Gautier v Pro-Football,* 304 NY 354, *supra*). In this case, there existed a legitimate connection between the theme of the telecast and the use of plaintiff's person in a brief scene designed to depict the departure of the main character from the institution in question, and nowhere was the plaintiff singled out for consideration. We hold, therefore, that the use of plaintiff's name and picture in the subject documentary film did not constitute a violation of sections 50 and 51 of the Civil Rights Law.

By extension, licensing of the documentary film by CBS for distribution and exhibition purposes also remains privileged.

As was observed in *Gautier v Pro-Football* (*supra,* p 359): "Like other media of communication, television may have either a trade aspect or an informative or news aspect. In the latter situation, it should be entitled to the same privilege accorded other such media where the statutory right to privacy is drawn in issue." (See, also, *Youssoupoff v Columbia Broadcasting System,* 41 Misc 2d 42, affd 19 AD2d 865.) Inasmuch as the privilege is founded upon society's interest in the free flow of information, that privilege is not diminished by the manner in which such information is disseminated. Indeed, the licensing agreement for the distribution of the televised documentary has no different effect than the printing and disseminating of multiple copies of any newsworthy article.

We also find that the use in question is too fleeting and incidental to be actionable (see *Stillman v Paramount Pictures Corp.,* 2 AD2d 18, affd 5 NY2d 994; *University of Notre Dame Du Lac v Twentieth Century-Fox Film Corp.,* 22 AD2d 452, affd 15 NY2d 940). Whether a particular use is incidental is determined through an assessment of the "relationship of the references to a particular individual 'to the main purpose and subject of the [work in issue]'" (*Ladany v Morrow & Co.,* 465 F Supp 870, 882). At bar

plaintiff's approximately four-second appearance was not only fleeting, but his role was very minor to the central theme of the documentary.

As a matter for further consideration, plaintiff in this instance executed a "CONSENT FOR PATIENT INTERVIEW" form, authorizing the use of information concerning him in promoting public understanding and support "for the mentally disabled". The Mental Hygiene Law and Public Health Law establish certain patient privileges which may be waived by consent (Mental Hygiene Law, § 33.13, subd [c], pars 1, 4, cl [ii]; Public Health Law, §§ 17, 2803-c, subd 3, pars b, f; § 2805-g, subd 3). Ordinarily the written consent of a plaintiff to the use of his name and depictions of his person will remove such use from the statutory protection. The written consent in this case, however, did not satisfy the requirements of sections 50 and 51 of the Civil Rights Law since it was not a consent to include plaintiff in the telecast and was not executed in accordance with the regulations of the Department of Mental Hygiene (see 14 NYCRR 22.3 [a], [b]).

Since the use of plaintiff's name and image was not for advertising purposes, or for purposes of trade, but rather was used in a documentary addressing a subject of legitimate public interest, the written consent of the plaintiff was not required for purposes of the telecast or the subsequent dissemination of the film for nontheatrical exhibition (see *Cullen v Grove Press,* 276 F Supp 727; *Joseph Burstyn, Inc. v Wilson,* 343 US 495, 501). Accordingly, the issue of the validity of the written consent is irrelevant since the telecast and subsequent dissemination were not subject to the provisions of the Civil Rights Law.

In addition, no basis exists for plaintiff's claim of the violation of his constitutional right of privacy. We note that to the extent that such a right has been recognized, it protects against governmental intrusion into matters of personal choice (*Paul v Davis,* 424 US 693, 712-713; *People v Onofre,* 51 NY2d 476, 485). The constitutional right of privacy deals generally with substantive aspects of the Fourteenth Amendment and is limited to those which are fundamental or implicit in the concept of ordered liberty relating to marriage, procreation, contraception, family

relationships and child rearing and education (*Paul v Davis, supra,* p 713). The permission and consent of the Creedmoor director and unit supervisor for the production of this news documentary and the actions of the hospital staff were not, in our opinion, such State action as could have violated the plaintiff's constitutional right of privacy.

Finally, to the extent that the order appealed from granted plaintiff's motion for summary judgment based upon Special Term's *sua sponte* holding that the plaintiff's right of publicity was violated by the televising of the documentary, such was error. Plaintiff has not demonstrated that he is in any fashion a public personality (*Greenberg v CBS, Inc.,* 69 AD2d 693; *Wolston v Reader's Digest Assn.,* 578 F2d 427, 429, revd on other grounds 443 US 157). A public personality's interest in his personality "is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation" (*Zacchini v Scripps-Howard Broadcasting Co.,* 433 US 562, 573). In addition, the defendants must have misappropriated plaintiff's property interest in his name or face, leading the public to believe that the plaintiff supports the use of his personality, name or face (*Zacchini v Scripps-Howard Broadcasting Co., supra*). The plaintiff has failed to allege or in any manner support these two essential elements of defendants' alleged violation of the right of publicity (see *Brinkley v Casablancas,* 80 AD2d 428; *Lombardo v Doyle, Dane & Bernbach,* 58 AD2d 620), and thus plaintiff has not shown the existence of such a cause of action in this instance.

The order of Special Term should therefore be reversed insofar as appealed from, on the law, without costs or disbursements, plaintiff's motion for summary judgment should be denied in its entirety, defendants' cross motion for summary judgment should be granted in its entirety, and the plaintiff's second cause of action should be dismissed.

DAMIANI, J. P., TITONE and WEINSTEIN, JJ., concur.

Order reversed insofar as appealed from, on the law, without costs or disbursements, plaintiff's motion for sum-

mary judgment denied in its entirety, defendants' cross motion for summary judgment granted in its entirety, and the plaintiff's second cause of action dismissed.