CATHERINE GAETA, Respondent-Appellant, v NEW YORK NEWS, INC., et al., Appellants, and "WALTER" H. JAMES, Also Known as W. H. JAMES, the First Name Being Fictitious, the True Name of the Party Being Unknown, et al., Respondents.

First Department, August 18, 1983

APPEARANCES OF COUNSEL

*Michael B. Mukasey* of counsel (*Eugene M. Gelernter* with him on the brief; *Patterson, Belknap, Webb & Tyler,* attorneys), for New York News, Inc., and another, appellants.

*Frank C. McDermott* for respondent-appellant.

*Robert M. Redis* of counsel (*Alice Neff Lucan* with him on the brief; *McCarthy, Fingar, Donovan, Drazen & Smith,* attorneys), for Gannett Co., Inc., *amicus curiae.*

OPINION OF THE COURT

KASSAL, J.

We are confronted with a novel question concerning the legal standard controlling alleged defamatory utterances in a news article where the libelous statement may not itself be within the sphere of legitimate public concern, although the article, as a whole, deals with a newsworthy subject.

■ The prime issue is whether the *Chapadeau* criteria (*Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196) apply. In *Chapadeau,* it was held that where a news article is "arguably within the sphere of legitimate public concern", the party allegedly defamed must establish that "the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (38 NY2d, at p 199). If that standard be inapplicable, as Special Term concluded, we must determine what the legal standard is to measure any attendant liability. Under the circumstances of this case, we agree with Special Term in applying a lesser standard in denying the motion by the New York News and its reporter, Marcia Kramer, for summary judgment dismissing the complaint.

FACTS AND BACKGROUND

This defamation action seeks to recover damages flowing from the publication in the *New York Daily News* (*News*) of a statement concerning plaintiff in one of a series of

articles written by an investigative reporter, Marcia Kramer (Kramer), on the subject of the deinstitutionalization of mental patients. The series appeared in July, 1977 and concerned the placement of former mental patients in nursing homes, focusing upon their treatment. Apparently, some two months of investigation had been expended in the preparation of the series. The article related the experience of a former mental patient, one George Nies, who had been placed in a nursing home after his discharge from a State mental hospital. The alleged defamatory statement prominently appeared in the first sentence of the article as follows: "When he was 41, George Nies, a Queens construction worker, suffered a nervous breakdown that psychiatrists said was *precipitated by a messy divorce and the fact that his son killed himself because his mother dated other men*" (emphasis added).

Plaintiff, the former wife of George Nies and the person claimed to be aggrieved by the article, claims that the information as to Nies' psychiatric history was false and was defamatory as to her. They were married in 1947. She divorced Nies in 1965, two or three years prior to his admission to the VA Hospital at Fort Hamilton. According to plaintiff, he did not suffer a "nervous breakdown" but had a long history of alcoholism prior to the hospital admission. Plaintiff had remarried in 1970, assuming the name of her present husband. She claims their son, referred to in the article, died in 1975, following an overdose of methadone. This was five years after plaintiff had remarried and several years after Nies had been admitted to the hospital. Plaintiff denies the divorce was "messy", that the death of their son resulted from suicide and that she had "dated other men". In seeking punitive damages of $1,000,000 and $250,000 in compensatory damages, plaintiff alleges that the statement was published with knowledge of its falsity or with reckless disregard as to whether it was true or false.

Defendant Kramer had been assigned the task of researching and writing a series of articles, dealing with the release of mental patients from institutions in the New York metropolitan area. Mr. Nies' situation had been called to her attention by an undisclosed person in the

office of Nursing Homes Special Prosecutor Charles Hynes, who also referred Kramer to Nies' sister, Dorothy Sorrentino, as a reliable source. Kramer contacted Mrs. Sorrentino and spoke to her two or three times concerning the treatment accorded to Nies and his psychiatric history. Sorrentino told her that psychiatrists had said that his breakdown had been precipitated by a messy divorce and the fact that his son killed himself because his mother was dating other men. This is the story in the news article.

However, it is undisputed that Kramer acquired the reported information from Mrs. Sorrentino, not from any psychiatrists, as was stated in the article. The only attempt by her to verify the Sorrentino account occurred when the reporter twice contacted psychiatrists at Creedmoor State Hospital, where Mr. Nies had previously been hospitalized, but on both occasions the doctors refused on the basis of confidentiality to discuss Nies' psychiatric history. Subsequently, Kramer visited the nursing home where Nies was located but she did not speak with him. She claimed she did not speak to Nies, since that "would have compromised my assumed role for me to have asked to speak to Mr. Nies, who I would have had no reason to know." Instead, she posed in an undercover capacity, purportedly seeking information about the possible placement of her mother and, while there, observed conditions at the nursing home. In fact, her first-hand observations did confirm the Sorrentino information as to conditions at the institution.

Although two months of investigation had allegedly been expended in the preparation of the article, at no time did the writer attempt to contact the plaintiff. According to Kramer, she had no knowledge as to the remarriage of Nies' former wife or her married name or her location. She said she had no reason to doubt the accuracy of the information provided her by Mrs. Sorrentino and there was no reason to suspect the possibility of a grudge against the plaintiff. However, the record discloses that, since 1960, plaintiff had been working as a waitress in the same restaurant as presently and no attempt was made to verify the accuracy of the statement that the former wife had been "dating" other men while she was married to Nies or the cause of death of their son. Further, the defendants have neither published nor offered to publish a retraction.

PROCEEDINGS

After joinder of issue, plaintiff moved to dismiss certain affirmative defenses. The motion was partially granted, insofar as relevant here, dismissing the third affirmative defense which alleged that the publication, arguably within the sphere of public concern, was privileged under the *Chapadeau* standard. In striking the defense, Justice KORN had previously concluded that the statement that plaintiff had caused the death of her son because she dated other men had no newsworthy bearing upon the principal subject of the article, which was the treatment accorded to nursing home patients: "In the present case the relationship between plaintiff and her son was not a matter of public interest, and was neither an integral nor a non integral part of the nursing home news story."

The defendants appealed that determination but the appeal was subsequently withdrawn. Thereafter, amended answers were served, the parties proceeded with disclosure and the defendants then moved for summary judgment dismissing the complaint. Special Term granted the motion as against defendants James and O'Neill, the former publisher and editor of the *News,* finding that neither had played any role in preparing or editing the series of articles. However, the court denied the motion by the *News* and Kramer, concluding that there were factual issues as to whether defendants had exercised due care in reporting and publishing the statements alleged to be defamatory, taking into account the foreseeable danger of injury as a result of the publication and the reasonableness of defendants' conduct (115 Misc 2d 483).

In declaring the operative standard, Special Term properly found itself bound by law of the case to follow the earlier determination of Justice KORN, which had held the *Chapadeau* standard inapplicable to the facts of this case. As a result, to the extent that the complaint sought compensatory damages, the court applied negligence principles in adopting a lesser degree of care than that imposed by *Chapadeau.* As to the claim for punitive damages, a far greater burden was imposed requiring a demonstration that defendants had knowledge of the falsity of the statement or proceeded in reckless disregard for the truth (*Gertz*

*v Robert Welch, Inc.,* 418 US 323, 349). In a thorough analysis, Special Term concluded that had Kramer further inquired as to the dates of the hospitalizations, the divorce and the death of the son, she might have been alerted to the inaccuracy of the information which had been related to her. Cited was the fact that she did not seek the names and addresses of Nies' mother, ex-wife or sons to obtain corroboration, particularly when the psychiatrists refused to discuss the facts. The court found these factual issues sufficient to deny summary judgment.

In preserving the claim for punitive damages for trial, Special Term relied upon *Greenberg v CBS Inc.* (69 AD2d 693, 710) concluding that a more rigorous standard be applied to investigative reporting than to basic news reporting, warranting a higher degree of care by reason of the greater time for verification afforded the investigative reporter, with the opportunity, generally, to check inconsistencies, obtain corroboration and check facts. Since Kramer had more than two months to verify the facts, her failure to do so and whether it was necessary under the circumstances, posed factual issues to be resolved at trial.

On appeal, defendants contend that Special Term's refusal to apply the "grossly irresponsible" standard of *Chapadeau v Utica Observer-Dispatch (supra)* constituted error and that the absence of proof of actual malice requires dismissal of the claim for punitive damages. While they recognize that Special Term was bound by law of the case to follow the prior determination of Justice KORN, they argue that the doctrine does not apply on this appeal so as to preclude us from a determination on the merits (see *Jarai-Scheer Corp. v St. Paul Fire & Mar. Ins. Co.,* 52 AD2d 555; *Di Fresco v Starin,* 81 AD2d 629). In seeking reversal, they point to the absence of any proof in the record to reflect that the reporter proceeded in a grossly irresponsible manner.

While we agree that law of the case does not bind us, nevertheless, we find, under the circumstances of this case, that the gross irresponsibility standard of *Chapadeau (supra)* does not apply. The critical factor is that the statement concerning plaintiff, in terms of the sphere of the public interest, has no relationship to the newsworthy

content of the balance of the article, which dealt with the treatment accorded former mental patients, placed in nursing homes with sane, elderly patients, and the conditions prevailing in these homes.

We reject the notion advanced by appellants that the mere fact that a statement appears in news print, in and of itself, places the statement within the sphere of legitimate public concern. *Chapadeau v Utica Observer-Dispatch (supra)* does not so hold. Nor, in a proper case, is the court divested of authority to determine that allegedly defamatory material, appearing in a publication, is so unrelated to the news or public interest content of the article as to be subject to a lesser standard of care than the *Chapadeau* standard of gross irresponsibility.

### PUBLIC OFFICIALS, FIGURES AND ISSUES

Concededly, plaintiff is a private individual. Accordingly, the legal standard applicable to defamation directed against a public official or public figure, in the landmark holding of the Supreme Court in *New York Times Co. v Sullivan* (376 US 254) does not apply. Considerations of public policy mandate that there be a minimal intrusion upon free comment directed to public officials and public issues. Thus, a public figure charging defamation must establish that the libelous publication was published with actual malice, i.e., that the party had knowledge that it was false or acted in reckless disregard for the truth.

In *Gertz v Robert Welch, Inc.* (418 US 323, *supra*) the Supreme Court recognized that private individuals, unlike public figures, were peculiarly suspectible to injury to reputation as a result of defamatory publication, in part because of the absence of an available forum to rebut false statements. The court there held that the States have a legitimate interest in the establishment of a standard of liability for a publisher or broadcaster of a defamatory falsehood dealing with a private individual, provided the local jurisdiction did not impose liability without fault (418 US, at pp 346-347). The Supreme Court directed that any recovery be limited to compensation for actual injury sustained and that punitive damages could only be obtained where there was actual malice, i.e., where there was a

showing of knowledge of falsity or a reckless disregard for the truth (418 US, at pp 348-349).

## MATTERS OF LEGITIMATE PUBLIC CONCERN

In *Chapadeau v Utica Observer-Dispatch* (*supra*) the New York Court of Appeals responded to the direction by the Supreme Court in *Gertz* and there defined the standard of liability to be imposed where the publication is "arguably within the sphere of legitimate public concern," as follows: "We now hold that within the limits imposed by the Supreme Court where the content of the article is *arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition,* the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (38 NY2d, at p 199; emphasis added).

Applying this principle to our case, we find the defamatory portion of the article has no reasonable relationship to the newsworthy portion, a matter of legitimate public concern. Taking cognizance of the scope and purpose of the article, which is to discuss conditions within nursing home facilities and the placement of former mental patients with elderly or infirm persons — clearly newsworthy matters affected with a public interest — the relationship of the plaintiff to her deceased son, the cause of his death, the nature of her divorce and unrelated details as to her private life, all remote in time and subject matter to the institutionalization of her former husband, are not "matters warranting public exposition". While the record does not explain the motive of the reporter in including these additional facts in the article, under the *Chapadeau* standard, they are not "arguably within the sphere of legitimate public concern" for purposes of this motion for summary judgment.

Unquestionably, the statements did add a certain flair or flavor and, to that extent, may be of general interest to the public. However, where the rights of private individuals may be adversely affected, some degree of care is required

prior to a mass newspaper publication of matters bearing no reasonable relationship to the public interest content of the story. The mere fact that the statement appears in print does not automatically invest it with the degree of "legitimate public concern" so as to immunize the publisher from liability except upon a showing of gross irresponsibility. In this case, the article was part of a series based upon investigative reporting, and the reporter presumably not only devoted considerable time in preparing the story but had ample opportunity to verify the facts before publication. The writing of this story — investigative reporting — demanded a more rigorous standard than basic news reporting, where time pressures, in terms of newsworthiness, are critical.

In *Greenberg v CBS Inc.* (69 AD2d 693, *supra*) plaintiff, a private individual, brought a defamation action against the television network, CBS, the producer and a correspondent for damages allegedly sustained in connection with the telecast of the show "60 Minutes", dealing with the subject of amphetamine abuse. Plaintiff, who did not appear on the program, was named and allegedly defamed by a former patient. The Appellate Division, Second Department, affirmed the denial of the motion and cross motion for summary judgment, concluding that there were questions of fact as to the falsity of the statements and the degree of care exercised by the network and the individual defendants in confirming the accuracy of the statements which had been made. Applying the *Chapadeau* standard, since amphetamine abuse was within the sphere of legitimate public concern and related to matters warranting public exposition, it was concluded that plaintiff must show gross negligence to support a recovery. In the course of its decision, the Second Department recognized the more stringent standard applicable to investigative reporting than basic news reporting, observing (69 AD2d, at pp 710-711):

"Thus, if it is questionable as to whether the network has met the standards of basic reporting, it is certainly questionable as to whether they met the more rigorous standards of investigative reporting. At trial, these questions must be assessed in the context of the medium's limitations

and the topic's continuing newsworthiness. Pressures of time, staff and budget, self-created or otherwise, are some of the factors which must be considered.

"In conclusion, it should be noted that investigative reporting is high-risk journalism. The degree of care which determines the amount of risk in such a venture lies exclusively within the control of those conducting and monitoring the investigation. In this case, the decisions of defendants in their endeavor must be evaluated at a trial."

The same holds true in our case. The proof as to the investigation conducted and the degree of care exercised requires a weighing and balancing, inappropriate for summary disposition. Fully mindful of the need to accord broad and liberal protection to freedom of the press, a right essential to the maintenance of a free society, we also must take cognizance of the individual's right to privacy and protection against unfair injury to his reputation resulting from the dissemination of false information to the public. These competing and interrelated considerations require a delicate balancing of interests. Although recent decisions by the Supreme Court have questioned whether the issue of a defendant's liability in a defamation action is readily susceptible to summary disposition (*Hutchinson v Proxmire,* 443 US 111, 120, n 9; *Wolston v Reader's Digest Assn.,* 443 US 157, 161, n 3), clearly, the remedy is available in a proper case (*Karaduman v Newsday, Inc.,* 51 NY2d 531, 545). There, the Court of Appeals, applying the *Chapadeau* standard, summarily dismissed the action on a finding that plaintiff's proof in opposing the motion for summary judgment, viewed objectively, was insufficient to demonstrate that the managing editor for *Newsday* had acted in a grossly irresponsible manner, without appropriate consideration for standards of sound journalism. Unlike the situation in our case, however, *Karaduman* involved a publication of matter which the court found was unquestionably within the sphere of legitimate public concern.

Following the direction of the Court of Appeals in *Karaduman* that "we must not be reluctant to apply the ordinary rules governing summary judgment in libel cases" (51 NY2d, at p 545), we find the facts in the present record

insufficient for summary resolution. The function of the court upon a motion for summary judgment is issue finding, not issue determination (*Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395, 404; *Esteve v Abad,* 271 App Div 725, 727). It is a most drastic remedy which should not be granted where there is any doubt as to the existence of a triable issue (*Moskowitz v Garlock,* 23 AD2d 943, 944), or where the issue is even arguable (*Barrett v Jacobs,* 255 NY 520, 522).

Appellants have argued that reversal should follow because of plaintiff's failure to come forward with evidentiary proof of irresponsibility as to the publication of the article. However, under the facts of our case, the objective evidence of the investigation and the care by the reporter in preparing the story have been set forth. Only a factual determination remains as to whether the appropriate standard of care has been met, which is a function solely for the trier of the facts. There are many questions, raised and left unanswered by the reporter's own account of what she did and did not do, all factual issues for trial. As to the claimed insufficiency of proof on the part of plaintiff in opposing the motion for summary judgment, until the moving party has established a right to judgment as a matter of law, a party opposing the motion need not offer any proof (*Zuckerman v City of New York,* 49 NY2d 557, 562; *Lurie v Child's Hosp.,* 70 AD2d 1032). It was incumbent upon the moving party to establish a prima facie case (*Wertheimer v New York Prop. Ins. Underwriting Assn.,* 85 AD2d 540, 541). The record adduced by defendants is insufficient for that purpose.

The record reflects the preparation of the article over a two-month period during which an investigation allegedly had been conducted. The reporter's notes, contained on a single page, typed and handwritten, are hardly sufficient for Special Term to determine whether the degrees of responsibility required of an investigative reporter had been employed. The investigation appears to be superficial, at best. Taking into account the nature of the charges directed against the plaintiff, that her "dating" of other men resulted in the suicide of her son and led to a "messy divorce" and a nervous breakdown by her former husband, a jury could conclude that some further affirmative action

was required to verify the innuendo of infidelity in the account offered by Mrs. Sorrentino. As Special Term held, had Kramer made further inquiry as to the dates of the hospitalizations, or the divorce, or the death of the son, she might have been alerted as to the accuracy or inaccuracy of the information imparted to her. While the reporter claims that she was unaware of plaintiff's whereabouts, the fact that she apparently made no inquiry at all does, indeed, have legal significance, especially in light of plaintiff's deposition that she had been working as a waitress in the same restaurant since 1960, 5 years before her divorce from Nies, 10 years before her remarriage and 17 years before the publication.

True, there was some attempt at corroboration by contact with psychiatrists at Creedmoor hospital, but their refusal to discuss Nies' history, based upon the physician-patient privilege, may not necessarily be sufficient without other verification. Kramer did recognize the need for corroboration since she visited the nursing home in Elmhurst where Nies had been placed, but this was clearly to examine conditions there, not for verification of plaintiff's role in his life. Admittedly she spoke to no physician, but the news report couched in the language "psychiatrists said" could lead to the erroneous conclusion that they were the source of the information, not Mrs. Sorrentino. There is a further factual issue as to whether Kramer should have been alerted as to Mrs. Sorrentino's possible bias against plaintiff.

With due concern for the full scope of the First Amendment and the trials and tribulations, especially in terms of time, of journalists and publishers, as expressed by both defendants and Gannett Co., Inc., appearing *amicus curiae,* and considering the severe nature of the charge, with its devastating impact upon the reputation of a private individual, fairness and common decency required the exercise of caution. A publication should be considered as a whole and not dissected or segmented out of context (*James v Gannett Co.,* 40 NY2d 415; *Julian v American Business Consultants,* 2 NY2d 1). However, that principle does not permit a newspaper to carelessly inject into an otherwise newsworthy article a defamatory statement with no rea-

sonable relationship to the news content of the story. When done and where the defamatory utterance is not within the sphere of legitimate public concern, the newspaper or publisher may not reasonably expect to be accorded the benefit of the strict *Chapadeau* standard of liability. By our disposition on this appeal we do not depart from that rule.

On this record, it appears that the derogatory statement was extraneous to the subject matter and news content of the article and thus, the *Chapadeau* standard does not automatically apply simply because the statement appears in a news story. That fact alone does not place the statement "arguably within the sphere of legitimate public concern". At the minimum, it is an issue for trial.

In any event, were we to apply the gross irresponsibility standard of *Chapadeau,* the sufficiency of the investigation could not be resolved on this record. The absence of any satisfactory explanation for the failure to verify the facts in light of the two-month period to prepare the series might be gross irresponsibility, "without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." (*Chapadeau v Utica Observer-Dispatch,* 38 NY2d, at p 199.) The standard of "gross irresponsibility," the Court of Appeals observed in *Karaduman v Newsday, Inc. (supra)* "demands no more than that a publisher utilize methods of verification that are reasonably calculated to produce accurate copy" (51 NY2d, at p 549). Under the circumstances of this case, the sufficiency of what was done and not done pose factual issues.

■ Conceivably, the deliberate injection into the news account of an unrelated, defamatory statement about plaintiff, a third party, palpably not in the sphere of public interest, might, likewise, rise to the higher level of reckless indifference and disregard, thereby supporting an award of punitive damages. Actual malice may be found where the content of the statements and the context in which they arose are sufficiently suggestive of possible falsity (*Vasquez v O'Brien,* 85 AD2d 791, 792).

### PUBLISHER AND EDITOR

■ We agree with the determination of Special Term, dismissing the complaint as against defendants James and

O'Neill, the former publisher and editor, respectively, since the record fails to show that either of them played any affirmative role in the preparation or editing of the article. The relationship of the individual publisher and editor, standing alone, is insufficient to impose liability (*Karaduman v Newsday, Inc.*, 51 NY2d, at pp 542-543). The court there refused to permit an inference of culpability to be raised as against an editor solely upon a showing that the reporter had been grossly irresponsible, since such a standard "would indirectly impose upon editors the burden of duplicating their reporters' work and rechecking with specificity all of their sources" (51 NY2d, at p 543). It was held that such a standard was unacceptable since it would impose a higher degree of care upon them than heretofore required and would unnecessarily interfere with freedom of expression by the press.

However, this holding does not free an editor from responsibility in every case. Any liability would be dependent upon the circumstances of the case and must be supported by a proper showing of culpable conduct on the part of the editor. As was observed by the Court of Appeals in *Karaduman v Newsday, Inc.* (51 NY2d, at pp 543-544): "Where the reporters have acted irresponsibly, an editor or managerial employee might be held personally liable, for example, upon a showing by concrete proof that he knew or had reason to know that his reporter or his reporter's sources were unreliable or subject to question. Similarly, proof that the procedures used by the newspaper in checking its stories were generally slipshod or careless could perhaps support an inference that the particular editor or manager personally 'acted in a grossly irresponsible manner' in allowing a statement to be published without making further inquiries about its accuracy. Evidence of such concrete facts is readily obtainable through the normal channels of discovery, and, if such facts exist, a motion by the defendant editor for summary judgment could easily be defeated through the submission by the plaintiff of objective proof * * * In light of the availability we can perceive no sound reason to accept bare speculations or inferences concerning an editor's subjective awareness of his reporter's alleged dishonesty as substitutes for specific proof of the editor's own 'grossly irresponsible' conduct."

Accordingly, the order, Supreme Court, New York County (SHIRLEY FINGERHOOD, J.), granting defendants' motion for summary judgment only to the extent of dismissing the complaint as against defendants James and O'Neill, denying so much of the motion for summary judgment dismissing the complaint as against defendants New York News and Marcia Kramer, should be affirmed, without costs or disbursements.

KUPFERMAN, J. P. (dissenting). While in the law of defamation, the decisions "are not entirely consistent"[1] and may indeed be inconsistent,[2] certain principles are at least currently well established and can be applied to the matter at hand.

The plaintiff complains of the lead paragraph in a news story, one of a series that appeared in the *New York Daily News* on abuses of patients who had been discharged from mental hospitals into nursing homes:

"When he was 41, George Nies, a Queens construction worker, suffered a nervous breakdown that psychiatrists said was precipitated by a messy divorce and the fact that his son killed himself because his mother dated other men.

"George was institutionalized, first in a Veteran's Administration hospital and then in Creedmoor State Hospital for the mentally ill in Queens Village. After two years there, he appeared to be making progress.

"Then, without his family's knowledge, state mental health officials discharged him and sent him to the Elmhurst Manor Home for Adults, 100-30 Ditmars Boulevard, Flushing. Approximately half the residents of Elmhurst Manor are sane elderly men and women, the rest are discharged mental patients like George Nies."

Plaintiff, now remarried, was at one time the wife of the George Nies referred to in the article.

Plaintiff alleges numerous factual inaccuracies in the challenged paragraph, but her most significant objections are to the statements that she dated other men and that her son killed himself because of that alleged fact, and that

---

1. *Cottom v Meredith Corp.,* 65 AD2d 165, 170 (SIMONS, J.); see Hale, The Future of Strict Liability in Libel, 5 [No. 2] Communications & Law 23, 26.

2. Compare *Silsdorf v Levine,* 59 NY2d 8 with *Velella v Benedetto,* 57 NY2d 788, affg on opn of SANDLER, J., 83 AD2d 465.

the son's suicide, as well as her alleged dating, precipitated the husband's breakdown. Plaintiff emphatically states in her complaint and affidavit that she did not date other men. Moreover, she states that her son did not kill himself but that he died of complications from a drug overdose some 5 years after her divorce and some 10 years after the onset of her former husband's mental problems, which she says resulted from chronic alcoholism.

The complaint names as defendants Marcia Kramer, the reporter who researched and wrote the story, New York News, Inc., which publishes the *Daily News,* as well as two individual officers of New York News, Inc., who serve, respectively, as publisher and editor. The complaint seeks both compensatory and punitive damages for injuries allegedly suffered to plaintiff's good name and reputation, socially and in connection with her employment.

In the order appealed from, Special Term (Shirley Fingerhood, J.), granted defendants' motion for summary judgment only with respect to the individual officers of New York News, Inc., on the authority of *Karaduman v Newsday, Inc.* (51 NY2d 531) and denied the motion in all other respects (115 Misc 2d 483). We are all agreed that Special Term correctly dismissed the complaint as against the editor and publisher. Nothing in the record suggests that either the editor or publisher had or should have had reasons to doubt the accuracy of the story. (See *James v Gannett Co.,* 40 NY2d 415, 424.)

However, because of a prior order entered on a motion to strike certain affirmative defenses at Special Term (Hyman Korn, J.), which held, *inter alia,* that the gross irresponsibility standard[3] of *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196) was not applicable because the item in issue "was not an essential part of the news story", the Justice at Special Term considered herself bound by "the law of this case" (115 Misc 2d 483, 485, *supra*).

The principle of "law of the case" applies only between courts of co-ordinate jurisdiction and therefore is not bind-

---

3. See Hale, The Future of Strict Liability in Libel, 5 [No. 2] Communications & Law 23, 35.

"A few states selected the constitutional malice standard of liability. New York adopted the gross irresponsibility standard enunciated by Justice Harlan in *Curtis Publishing Co. v Butts.*" (Metcalf, Rights and Liabilities of Publishers, Broadcasters and Reporters, § 1.17 ["Fault"].)

ing on an appellate court. (See *Rager v McCloskey,* 305 NY 75, 78; *Clark v New York Tel. Co.,* 52 AD2d 1030.) Accordingly, we should consider the correctness of that prior order.

There was substantial research for the series which ran on five days in July, 1977. The item on George Nies came from information obtained from his sister[4] after the reporter was given Nies' name by the office of the special nursing homes prosecutor as a subject to exemplify the nursing home problems.

The reference to psychiatrists came from the sister, and when the reporter sought corroboration, doctors at Creedmoor State invoked the doctor-patient privilege.

It is contended that the reporter should have pursued an in depth verification study before the reference to plaintiff, but it was not the focus of the series. Opinions may differ about how much investigation should bottom any story, but the minimum standard would have been reached. Certainly, as to punitive damages, there was no malice or knowledge of falsity or reckless disregard of the truth. (*Gertz v Robert Welch, Inc.,* 418 US 323; cf. *Le Mistral v Columbia Broadcasting System,* 61 AD2d 491, 495.)

In order for the content of an article to come within the qualified privilege described in *Chapadeau,* it need only be "reasonably related to matters warranting public exposition". (See *Chapadeau v Utica Observer-Dispatch,* 38 NY2d, at p 199; cf. *Delan v CBS, Inc.,* 91 AD2d 255 [an action under Civil Rights Law, §§ 50, 51 for unauthorized use of plaintiff's photograph, the court required only a "legitimate connection"[5] between the use of plaintiff's name and picture and the matter of public interest sought to be portrayed].)

In the present case, the published matter involving plaintiff bears a reasonable relation to the subject of public interest. The journalistic technique of focusing on an individual case to exemplify and expose problems that are

---

**4.** Consider Dickerson, Fashioning a New Libel Defense: The Advent of Neutral Reportage, 3 Communications & Law 77, 79 [Summer, 1981].

**5.** It is not even necessary in a news story that the photograph have any connection insofar as the newspaper is concerned. (*Arrington v New York Times Co.,* 55 NY2d 433, cert den __ US __, 103 S Ct 787.)

typical throughout the subject matter is a common practice frequently used to attract the reader's attention and make an otherwise dry story interesting. There can be no dispute that the subject matter of the series of articles is within the sphere of legitimate public concern. (*Cottom v Meredith Corp.,* 65 AD2d 165.)

Accordingly, the order of the Supreme Court, New York County (SHIRLEY FINGERHOOD, J.), entered on September 16, 1982, should be modified to grant defendants' motion for summary judgment dismissing the complaint in its entirety.

CARRO and FEIN, JJ., concur with KASSAL, J.; KUPFERMAN, J. P., and SILVERMAN, J., dissent in an opinion by KUPFERMAN, J. P.

Order, Supreme Court, New York County, entered on September 16, 1982, affirmed, without costs and without disbursements.