Jackie Collins **LERMAN,**
**Plaintiff-Appellee,**

v.

**FLYNT DISTRIBUTING CO., INC.,**
**Defendant-Appellant.**

**No. 724, Docket 83–7735.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 30, 1984.

Decided Sept. 10, 1984.

See also 544 F.Supp. 966, 521 F.Supp. 228, 496 F.Supp. 1105.

Jeffrey H. Daichman, New York City (Norman Roy Grutman, Grutman Miller Greenspoon & Hendler, New York City, of counsel), for plaintiff-appellee.

Edward S. Rudofsky, New York City (David L. Kahn, Los Angeles, Cal., Frederick A. Polatsek, Zane & Rudofsky, New York City, of counsel), for defendant-appellant.

Irving Scher, New York City (Lauren W. Field, Tami J. Aisenson, Weil, Gotshal & Manges, New York City, of counsel), for Intern. Periodical Distributors Ass'n, Inc., American Booksellers Ass'n, Inc., Nat.

Ass'n of College Stores, and Periodical and Book Ass'n of America, Inc., amici curiae.

Before VAN GRAAFEILAND and CARDAMONE, Circuit Judges, and BONSAL, District Judge.*

CARDAMONE, Circuit Judge:

Freedom of expression preserves all other liberties so inseparably that freedom of the press and a free society either prosper together or perish together. Yet, because of its enormous power, the contemporary press is under heavy attack because of a widely held perception that it uses its special First Amendment status as a license to invade individual privacy. This case illustrates the complexity of the concerns when these interests clash.

Defendant, a national distributor of magazines in which offensive material concerning plaintiff appeared, appeals from a judgment in plaintiff's favor. In her action plaintiff asserted causes of action for libel, violation of a statutory right of privacy, and appropriation of the common law right to publicity. In every invasion of privacy suit there is a course to be run in order for plaintiff to reach the goal of recovery. In this case, plaintiff's libel action was dismissed and her right to publicity claim fails to fit within that tort. The civil rights cause does not lie as one for advertising purposes, as that term is defined under state law; but it does state a cause of action for defendant's invasion for trade purposes of her right to privacy. Having successfully progressed that far, plaintiff would need to demonstrate a level of defendant's fault on that privacy claim sufficient to satisfy constitutional protection for freedom of the press. Here, on the final lap, plaintiff's proof falls short.

### I Background

On February 29, 1980 the plaintiff Jackie Collins Lerman received a package at her home in London, England. An accompanying letter from a publicity agent who had formerly worked with Ms. Lerman explained that nude photographs, supposedly of plaintiff, appeared in the enclosed advance copy of *Adelina* magazine. Plaintiff discovered that the May 1980 issue of *Adelina* had misidentified her as an actress who appeared in Ms. Lerman's and her husband Oscar Lerman's movie entitled "The World is Full of Married Men." Two black and white photographs of the anonymous actress printed from the movie film appeared on pages 120–21 of the magazine. The misidentified actress appears topless in one of the pictures and in an "orgy" scene in the other. The caption identifies the photos as being Ms. Lerman and labels her as the "starlet" who appeared in an orgy scene in the film.

The cover of the magazine proclaimed to its readers: "In the Nude from the *Playmen* archives ... Jackie Collins." The short article accompanying the actress' photo with Ms. Lerman's name comments on the increasing willingness of "serious" actresses to appear nude in films. While Ms. Lerman authored the book and wrote the screenplay for "Married Men" and her husband directed the movie, she did not appear in the movie, clothed or otherwise, and has never appeared nude in public.

Immediately upon receipt of this package, Ms. Lerman retained a lawyer and three weeks later—on March 24, 1980—commenced an action in the United States District Court for the Southern District of New York (Werker, J.) against the publisher, Chuckleberry Publishing, Inc. ("Chuckleberry"), and against the original national distributor, Publishers Distributing Company, Inc. ("PDC" or "Publishers Distributing") based upon the May 1980 publication and distribution of *Adelina*. Plaintiff sought an injunction and damages based on (a) libel (b) defendant's violation of New York's Civil Rights Law §§ 50–51 and (c) invasion of her common law right to publicity.

---

* Honorable Dudley B. Bonsal, United States District Court Judge for the Southern District of New York, sitting by designation.

On March 31 the district judge issued a preliminary injunction restraining the distribution of *Adelina*. While the extent of the original defendants' compliance with that injunction is disputed, it is clear that Publishers Distributing informed all of its more than 500 nationwide wholesale customers of Ms. Lerman's lawsuit and the outstanding injunction, and requested that all unsold copies of the magazine be returned. Chuckleberry nevertheless included in its June 1980 *Adelina* issue a subscription solicitation page that reprinted, in reduced size and among other reprinted *Adelina* covers, the May 1980 cover page that claimed to contain a photo of Jackie Collins "In the Nude from the Playmen archives." The identical solicitation page appeared six months later in the January 1981 issue of *Adelina.*

On March 17, 1980, shortly before the original lawsuit was commenced, but after the May issue of *Adelina* was already in the channels of distribution, Flynt Distributing Company (Flynt Distributing or FDC), the present appellant, purchased the contract to distribute *Adelina* from Publishers Distributing. Flynt Distributing was joined as a party defendant to this litigation in April 1981. Plaintiff sought the same relief against Flynt Distributing with respect to the June 1980 and January 1981 distribution of *Adelina* as she had sought against the original defendants for the May publication. In an amended complaint plaintiff asserted these same causes of action against Flynt Distributing for the May 1980 issue.

The district court granted plaintiff's motions for summary judgment against Chuckleberry Publishing, Publishers Distributing and Flynt Distributing for violations of New York's Civil Rights Law §§ 50–51 and for defendant's invasion of plaintiff's right to publicity. Plaintiff's libel action against the defendants was dismissed. In February 1983 plaintiff settled

with Publishers Distributing for $100,000. Chuckleberry is in Chapter 11 bankruptcy reorganization.

In June 1983, with both original defendants out of the case, plaintiff proceeded to trial before a jury against Flynt Distributing. Ms. Lerman sought damages under her New York statutory privacy claim and her common law right to publicity arising from the May 1980 publication. Inasmuch as liability had already been determined in her favor by the trial court's grant of summary judgment, she also sought damages for distribution of the June 1980 and January 1981 editions of *Adelina*. After a short trial the jury returned a special verdict determining that defendant Flynt Distributing was liable for the May 1980 issue and awarding Ms. Lerman a total of $7 million in compensatory and $33 million in exemplary damages.[1] The trial court struck $30 million from the exemplary damage award, leaving intact an award of $7 million compensatory and $3 million exemplary damages. It is from this $10 million judgment that defendant Flynt Distributing has appealed.

Since plaintiff has not cross-appealed, we need not consider whether the district court correctly dismissed plaintiff's libel claim on the ground that she failed to plead special damages. Discussion will focus primarily on two causes of action—New York's statutory action for violation of the right of privacy and the common law action for violation of the right to publicity. The parties agree that New York law governs in this diversity case.

## II Grounds for Recovery Under State Law

### A. Background Leading to Enactment of New York's Right of Privacy Statute

The traditional common law rein on media abuse was the libel action. But in 1890 Samuel Warren and Louis Brandeis an-

---

1. The jury returned the following verdicts:

| | Compensatory | Exemplary |
|---|---|---|
| May 1980 | $800 thousand | None |
| June 1980 | 1.2 million | $ 1.0 million |
| Jan. 1981 | 5.0 million | 32.0 million |
| TOTAL VERDICTS | $7.0 million | $33.0 million |

nounced their recognition of a developing right of privacy. *See generally* S. Warren and L. Brandeis, *The Right of Privacy*, 4 Harv.L.Rev. 193 (1890). The article was a direct response to perceived abuses by the mass media of the day:

> The press is overstepping in every direction the obvious bounds of propriety and of decency.... [M]odern enterprise and invention have, through invasions upon [man's] privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury.

*Id.* at 196.

Following the Warren-Brandeis article, courts were asked to recognize this "new" tort. The New York Court of Appeals rejected the invitation in *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442 (1902), where the picture of an attractive young woman, used without her permission, adorned more than 25,000 posters advertising the defendant's flour. Her suit for this invasion of her privacy was dismissed by New York's highest court. In 1903 the public outcry over this seemingly unfair decision resulted in the enactment by the New York State Legislature of sections 50 and 51 of the Civil Rights Law, entitled "Right of Privacy." Section 50 provides criminal penalties for the use of a person's name, picture or likeness for advertising or trade purposes (the only two cases ever brought under § 50 were dismissed before trial), and § 51 gives the individual victim of such use the right to obtain an injunction and a cause of action to obtain compensatory and exemplary damages:

> Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without [his] written consent ... may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner ... the jury in its discretion may award exemplary damages.

New York Civ. Rights Law § 51 (McKinney Supp.1983). New York's highest court has consistently reminded litigants that "there exists no so-called common law right to privacy" in New York. *Cohen v. Hallmark Cards, Inc.*, 45 N.Y.2d 493, 497 n. 2, 410 N.Y.S.2d 282, 382 N.E.2d 1145 (1978); *see Arrington v. The New York Times Co.*, 55 N.Y.2d 433, 440, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (1982).

## B. *New York's Right of Privacy Statute*

In granting summary judgment to plaintiff against the original defendants, Publishers Distributing and Chuckleberry, under sections 50–51,[2] the district court stated: "To make out a claim under section 51, a plaintiff must establish (1) that the defendant used plaintiff's name, portrait or picture within the state, (2) for purposes of advertising or trade, and (3) without first obtaining plaintiff's written consent." 496 F.Supp. 1105, 1107–08. The trial court continued, "The fact that Publishers [PDC] may not have known that the plaintiff's name was being used without her consent and in the manner in which it was used is irrelevant to the questions of compensatory damages and injunctive relief." *Id.* at 1109. The court did not then decide the public figure question, concluding that actual malice was not required even if plaintiff were a public figure where the use was not informational but rather, "completely exploitive, [and] commercial." Id. at 1110. The district court held "there is no such informational or newsworthy dimension to Chuckleberry's unauthorized use of plaintiff's name," and that "the use of her name was for a commercially exploitive effect rather than for the purpose of informing the public about a newsworthy event." *Id.* at 1107–08. As we shall discuss shortly, these statements were in some respects inaccurate and in other respects erroneous

**2.** Because the provisions of § 50 are incorporated in § 51, reference will be made only to § 51.

as a matter of law. The district court was equally in error in its June 3, 1982 opinion when it granted summary judgment to plaintiff against Flynt Distributing. 544 F.Supp. 966.

On its face the New York privacy statute seems to provide a cause of action only for "commercial appropriation," defined in *Roberson* as the defendant's act, "for his own selfish purpose to use the picture or the name of another for advertising purposes without his consent." *Roberson, supra,* 171 N.Y. at 545, 64 N.E. 442. Commentators and the American Law Institute recognize "commercial appropriation" as only one of four kinds of invasion of privacy and distinguish it from the torts of publicly placing a person in a false light, intrusion upon one's personal solitude and the public disclosure of private facts. *See, e.g.,* W. Prosser, *Privacy,* 48 Cal.L.Rev. 383, 389 (1960); Restatement (Second) of Torts § 652A (1976). The last two invasions—intrusion upon personal solitude and public disclosure of private facts—are not the subject of any claim on this appeal. The first two torts—commercial appropriation and false light—are implicated.

Analysis must commence with the New York statute and the substantial case law it has spawned. *See,* L. Savell, *Right of Privacy—Appropriation of a Person's Name, Portrait or Picture for Advertising or Trade Purposes Without Prior Written Consent: History and Scope in New York,* 48 Albany L.Rev. 1 (1983). The terms "advertising purposes" and "trade purposes" constitute the two prongs of the statute and their meaning, as construed by New York courts, is crucial to an analysis of plaintiff's claims in this case.

1. *Advertising Purposes Under § 51*

■ Where the use of plaintiff's name is solely for the purpose of soliciting purchasers for defendant's products the advertising purposes prong of the statute is violated. *See, e.g., Flores v. Mosler Safe Co.,* 7 N.Y.2d 276, 284, 196 N.Y.S.2d 975, 164 N.E.2d 853 (1959) (defendant safe company reprinted in an advertising circular a newsphoto of a burning building and the ac-companying news story, which mentions plaintiff's name several times and relates how the fire started when plaintiff returned some merchandise); *Selsman v. Universal Photo Books, Inc.,* 18 A.D.2d 151, 152, 238 N.Y.S.2d 686 (1st Dep't 1963) (camera manual where use of plaintiff's name and picture held to be for advertising purposes because it went beyond educational purpose and expounded the virtues of the camera). To be a use for advertising purposes, "the use must appear in or as part of an advertisement or solicitation for patronage." *Ginsberg v. News Group Publications,* 9 Med.L.Rep. 2014, 2016 (Sup.Ct. Nassau Cty. 1983); *see also Eliah v. Ucatan Corp.,* 433 F.Supp. 309, 312 (W.D.N.Y.1977) (use of picture to advertise suntan products); *Negri v. Schering Corp.,* 333 F.Supp. 101 (S.D.N.Y.1971) (photo of Pola Negri used to advertise antihistamene tablets); *Reilly v. Rapperswill Corp.,* 50 A.D.2d 342, 377 N.Y.S.2d 488 (1st Dep't 1975) (plaintiff's film used to advertise insulation). The New York Court of Appeals has held that to be liable for compensatory damages for use of a person's name, portrait or picture based on an advertising purpose claim, defendant need not have known that its use was without plaintiff's consent. *Welch v. Mr. Christmas,* 57 N.Y.2d 143, 149, 454 N.Y.S.2d 971, 440 N.E.2d 1317 (1982); *accord, Cohen v. Herbal Concepts, Inc.,* 100 A.D.2d 175, 473 N.Y.S.2d 426 (1st Dep't 1984).

■ When the advertisement is merely incidental to a privileged use there is no violation of § 51. *See Sidis v. F–R Publishing Corp.,* 113 F.2d 806, 810 (2d Cir.), *cert. denied,* 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940) (biographical sketch of child prodigy originally published in magazine and later used to advertise the sketch in a newspaper unobjectionable). Plaintiff cannot argue that the use of her name (accompanied by a photo of an unclad woman) in the May 1980 issue of *Adelina* was for advertising purposes. She did not show a "use for the solicitation of patronage for a particular service or product." *Pagan v. New York Herald Tribune,* 32

A.D.2d 341, 343, 301 N.Y.S.2d 120 (1st Dep't 1969), aff'd, 26 N.Y.2d 941, 310 N.Y. S.2d 327, 258 N.E.2d 727 (1970). The June 1980 and January 1981 uses could be viewed as for advertising purposes since they solicited orders for back issues of *Adelina.* But, the republications in the June 1980 and January 1981 subscription solicitations were incidental to the May 1980 publication. Because the solicitations were designed simply to convey the nature and content of past *Adelina* issues, they cannot form the basis for an independent claim under the advertising use prong of § 51. *See Sidis v. F–R Publishing Corp., supra,* 113 F.2d at 810; *Namath v. Sports Illustrated,* 48 A.D.2d 487, 488, 371 N.Y. S.2d 10 (1st Dep't 1975), *aff'd,* 39 N.Y.2d 897, 386 N.Y.S.2d 397, 352 N.E.2d 584 (1976); *Booth v. Curtis Publishing Co.,* 15 A.D.2d 343, 350, 223 N.Y.S.2d 737 (1st Dep't) (per curiam), *aff'd,* 11 N.Y.2d 907, 228 N.Y.S.2d 468, 182 N.E.2d 812 (1962). *Accord, Lawrence v. A.S. Abell Co.,* 299 Md. 697, 475 A.2d 448 (1984).

### 2. *Trade Purposes Under § 51*

■ Next, we examine whether the uses of plaintiff's name were for "purposes of trade" under the statute. Because the media in reporting the news routinely uses names and likenesses without consent, New York courts early recognized the need to encourage the free exchange of ideas and created a broad privilege for the legitimate dissemination to the public of news and information. *See, e.g., Humiston v. Universal Film Mfg. Co.,* 189 App.Div. 467, 178 N.Y.S. 752 (1st Dep't 1919); *Colyer v. Fox Publ. Co.,* 162 App.Div. 297, 299–300, 146 N.Y.S. 999 (2d Dep't 1914). The trade purposes prong of the statute may not be used to prevent comment on matters in which the public has a right to be informed. In *Gautier v. Pro-Football, Inc.,* 304 N.Y. 354, 107 N.E.2d 485 (1952), the Court of Appeals dismissed an animal trainer's objection to a televised broadcast of his act performed at half-time of a Washington Redskins' professional football game. Where plaintiff is a public personage or an actual participant in a news-

worthy event, the use of his name or likeness is not for purposes of trade within the meaning of § 51. *Id.* at 359–61, 107 N.E.2d 485. Yet, there are limits to the privilege: "While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information." *Id.* at 359, 107 N.E.2d 485. Since "newsworthiness" and "public interest" are to be "freely defined," *Arrington v. The N.Y. Times Co., supra,* 55 N.Y.2d at 440, 449 N.Y.S.2d 941, 434 N.E.2d 1319, the use of plaintiff's name in connection with the movie "The World is Full of Married Men" is a matter in which the public plainly has a legitimate interest.

■ Plaintiff may still be entitled to obtain the sanctions of § 51 under the trade purposes prong even where the use is in conjunction with a report on a matter of public interest, but in order to do so must meet one of two tests. First, a plaintiff may attempt to demonstrate that the use of plaintiff's name or likeness has no real relationship to the discussion, and thus is an advertisement in disguise. *See, Mayers v. Michals,* 9 Med.L.Rep. 1484 (N.Y.Cty. Sup.Ct.1983) (use of photo in connection with article on rape victims); *Martin v. Johnson Publ. Co.,* 157 N.Y.S.2d 409 (Sup. Ct.1956) (photographs of unknowing women used to illustrate article); *Metzger v. Dell Publ. Co.,* 207, 267 N.E.2d 56 Misc. 182, 186, 136 N.Y.S.2d 888 (N.Y.Cty.Sup.Ct. 1955) (use of bystanders' photo in article describing gangs in detective magazine); *cf. Murray v. New York Magazine Co.,* 27 N.Y.2d 406, 409–10, 318 N.Y.S.2d 474, 267 N.E.2d 256 (1971) (plaintiff who attended a St. Patrick's Day Parade in green hat and bow tie has no trade purposes claim against use of his picture in defendant's magazine in a story entitled "The Last of the Irish Immigrants"); *Delan v. CBS, Inc.,* 91 A.D.2d 255, 259, 458 N.Y.S.2d 608 (2d Dep't 1983) (mental patient has no trade purposes claim when shown in news docu-

mentary on mental hospitals); *Lahiri v. Daily Mirror,* 162 Misc. 776, 782–83, 295 N.Y.S. 382 (N.Y.Cty.Sup.Ct.1937) (professional photo of plaintiff used in story exposing "Indian Rope Trick" is use for general public interest, not for trade purposes). Alternatively, a plaintiff may claim that defendant forfeited the privilege for reporting matters on which the public has the right to be informed by proving that the defendant's use was infected with material and substantial fiction or falsity, *see Goldberg v. Ideal Publishing Corp.,* 210 N.Y. S.2d 928, 929 (Sup.Ct.N.Y.Cty.1960) (lurid account of rabbi's life in romance magazine). Even when so infected, for defendant to lose the newsworthy privilege plaintiff must prove that defendant acted with some degree of fault regarding the fictionalization or falsification. *Spahn v. Julian Messner, Inc.,* 21 N.Y.2d 124, 286 N.Y.S.2d 832, 233 N.E.2d 840 (1967), *appeal dismissed,* 393 U.S. 1046, 89 S.Ct. 676, 21 L.Ed.2d 600 (1969).

We cannot accept plaintiff's first argument that the photo in this case has "no real relationship" to any discussion in *Adelina.* Ms. Lerman wrote the book and screenplay that contained scenes of nudity for the film "The World is Full of Married Men." While the article in *Adelina* was vapid it did relate to the growing use of nudity in films. Insofar as the use of the name "Jackie Collins" is concerned the May 1980 use must be considered incidental to the story, and hence not objectionable as a "disguised advertisement" under § 51. *See University of Notre Dame Du Lac v. Twentieth Century Fox,* 22 A.D.2d 452, 256 N.Y.S.2d 301 (1st Dep't), *aff'd,* 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965). Further, plaintiff's status as an author and screenwriter of a film in the erotic genre makes her claim of "no connection" with these particular photographs unpersuasive. Certainly she has as much or more connection with this article than did the plaintiffs in *Murray, Delan* and *Lahiri, supra.* Thus, Ms. Lerman was not an innocent bystander without any relationship to the subject matter of the article and to the photograph.

Plaintiff's reliance on the alternative basis for defeating the newsworthy privilege rests on firmer ground, that is, the fictionalization or falsification ground. *See, e.g., Sutton v. Hearst Corp.,* 277 App. Div. 155, 98 N.Y.S.2d 233 (1950) (while woman was bequeathed one perfect rose a week by secret admirer, complaint stated cause of action because story so embellished as to be fictionalized). *See also Spahn v. Julian Messner, Inc., supra, Binns v. Vitagraph Co.,* 210 N.Y. 51, 56, 103 N.E. 1108 (1913) (war hero fictionalized). The *Spahn* court stated that the degree of falsity must be severe, and found it in that case because the former great National League pitcher's life had been significantly misrepresented by defendant. 21 N.Y.2d at 127, 286 N.Y.S.2d 832, 233 N.E.2d 840.

The recent case of *Davis v. High Society Magazine, Inc.,* 90 A.D.2d 374, 457 N.Y. S.2d 308 (2d Dep't 1982), *appeal dismissed,* 58 N.Y.2d 1115 (1983) is strikingly similar to this one. Plaintiff, a female boxer, discovered that the defendant publisher had misidentified her as a boxer pictured topless in defendant's magazine. The trial court granted plaintiff's summary judgment motion under § 51 without regard to the defendant's knowledge of the factual error. The Appellate Division found plaintiff to be a public figure and reversed the lower court's ruling. The court stated that "a public official or public figure seeking to recover against a media defendant under the Civil Rights Law because of some falsification must prove that the defendant was aware of the falsification or recklessly disregarded the truth." 90 A.D.2d at 382, 457 N.Y.S.2d 308. We believe *Davis* sets forth the correct analysis for this type of misidentification. Ms. Lerman attempts to distinguish *Davis* because there the plaintiff was a boxer, while Ms. Lerman has never been a "starlet." But the critical element in *Davis* as in this case is the misidentification, *i.e.,* the factual error. When presented with a factual error which brings an otherwise privileged newsworthy use with-

in the trade purpose prohibition, the Supreme Court and the New York Court of Appeals have required that there be a finding of fault. *See generally Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *Spahn v. Julian Messner, supra.*

We agree that plaintiff's name in all three *Adelina* issues are fictionalized or false and therefore lose the privilege that ordinarily extends to reporting matters in which the public has an interest. Further, the degree of falsity here was severe since plaintiff was not the actress pictured. Were it not for constitutional concerns this falsity would permit a properly instructed jury to find the uses here to be for trade purposes under § 51 of the New York Civil Rights law. But, precisely because of First Amendment guarantees Flynt Distributing cannot be held liable for the use of plaintiff's name unless it acted with the requisite fault, and it is on this last point that plaintiff's proof fails as we will later explain.

### 3. *Distributor's Liability Under § 51*

When dismissing plaintiff's libel claim in its August 1981 opinion, the district court ruled that "the New York courts have long held that vendors and distributors of defamatory publications are not liable if they neither know nor have reason to know of the defamation." 521 F.Supp. at 235. Thus, it granted summary judgment to Publishers Distributing on that issue as to the May 1980 article, but found "that questions of fact clearly are presented with respect to whether special circumstances existed requiring PDC to review the content of the issues of *Adelina* published after the May 1980 issue." Without discussion, the district judge then refused to apply this same limitation on distributor liability for § 51 purposes.

Flynt Distributing argues that plaintiff failed to prove that it "used" her name or picture under § 51. This argument is quite like a defendant's argument at common law that he did not "publish" a libel. *See, e.g.,* W. Prosser, Law of Torts § 113, at 775 (4th ed. 1971). *See Industrial Equipment Co. v. Emerson Electric Co.,* 554 F.2d 276, 289 (6th Cir.1977); *Skeoch v. Ottley,* 377 F.2d 804, 808 (3d Cir.1967); Restatement (Second) of Torts §§ 577, 588 and comment d. While a similar requirement may exist in the law of privacy, J. Wade, *Defamation and the Right of Privacy,* 15 Vand.L.Rev. 1093, 1109 (1962), there is little contemporary case law in New York defining the contours of the "use" required for compensatory damages under § 51. But the New York Court of Appeals has ruled in a commercial appropriation case that defendant's lack of knowledge that plaintiff had not consented was no defense to a compensatory damage claim under § 51. *Welch v. Mr. Christmas, supra,* 57 N.Y.2d 143, 454 N.Y. S.2d 971, 440 N.E.2d 1317; *accord, Thompson v. Close-up, Inc.,* 277 App.Div. 848, 98 N.Y.S.2d 300 (1st Dep't 1950) (per curiam) (use by allegedly innocent mistake).

▪ We need not hazard to guess how New York Courts would apply these authorities to Ms. Lerman's claim. Rather, we assume that *Welch v. Mr. Christmas* correctly states the rule and that, as a matter of New York law, plaintiff met the "use" requirement merely by showing that Flynt Distributing purchased the contract entitling it to profits from the May 1980 issue and by participating in the distribution of the June and January issues of *Adelina.*

### C. *Plaintiff's Claim of a Right to Publicity*

In her complaint, plaintiff also included a cause of action based upon her common law right to publicity on which the district court granted her summary judgment. It is unnecessary to determine the precise outlines of that right under New York law because it is not implicated. Here, the right to publicity is essentially identical to the right to be free from commercial appropriation. *See, e.g., Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 571–72, 97 S.Ct. 2849, 2855, 53 L.Ed.2d 965 (1979); *see Winterland Concessions Co. v. Sileo,* 528 F.Supp. 1201, 1213 (N.D.Ill.1981). In light of the proof, a claim for commer-

cial appropriation or violation of the right to publicity does not lie. "[M]uch confusion shrouds the so-called 'right to publicity.'" *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 220 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). In *Factors,* we expressly equated this "separate tort" with Dean Prosser's privacy tort of appropriation of name or likeness. *Id.* at 220–22. *Accord, Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 834 (6th Cir. 1983). It is a right of relatively recent origin having been first applied by us in *Haelan Laboratories v. Topps Chewing Gum, Inc.,* 202 F.2d 866 (2d Cir.), *cert. denied,* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953). The right is one designed to encourage intellectual and creative works and to prevent unjust enrichment.

In a publicity case the plaintiff is not so concerned that the use occurs; he simply wants to be the one to decide when and where, and to be paid for it. The essence of the right is the plaintiff's substantial property interest in his "entire act," *Zacchini, supra,* 433 U.S. at 574, 97 S.Ct. at 2857, his likeness, *Grant v. Esquire,* 367 F.Supp. 876, 880 (S.D.N.Y.1973), or even his "style," *Groucho Marx v. Day and Night Co.,* 689 F.2d 317 (2d Cir.1982). The action is based upon defendant's attempt "to broadcast or publish that for which the performer normally gets paid." P. Samuelson, *Reviving Zacchini: Analyzing First Amendment Defenses in Right of Publicity and Copyright Cases,* 57 Tulane L.Rev. 836, 868 n. 120 (1983) (citing *Grant v. Esquire, supra*).

Because the plaintiff must generally have developed a property interest with financial value in order to prove that he suffered damages, the right is most frequently invoked by public figures or celebrities. *Estate of Presley v. Russen,* 513 F.Supp. 1339 (D.N.J.1981); *Hicks v. Casablanca Records,* 464 F.Supp. 426, 429 (S.D.N.Y.1978). Thus, Ms. Lerman's insistence that she is a private person insofar as *these Adelina* articles are concerned does not square with her claim that her right to

publicity was appropriated. Plaintiff did not establish a prima facie cause of action for violation of her right to publicity. She has never exploited the value of her nude appearance and obviously cannot claim to have developed a property interest in the subject matter of this alleged infringement. Moreover, proof that this is not a right to publicity case is in plaintiff's demand for relief—she sought to enjoin publication and to salve her wounded feelings—neither of which are the kinds of injuries that the publicity tort is designed to remedy. There is simply no evidence that any defendant deliberately exploited plaintiff's fame and fortune. Inasmuch as the facts fail to establish a violation of plaintiff's right to publicity as a matter of law, her cause of action on that theory should have been dismissed.

### D. *False Light Tort Distinguishable from Right to Publicity*

Despite this conclusion, we undertake a brief analysis of the false light tort because it is essential to an understanding of the application of the First Amendment to § 51. While not specifically alleged in her complaint, Ms. Lerman's action presents a classic false light claim, which is distinguishable from her right to publicity cause of action. In *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), the Supreme Court observed that New York Courts have construed the language of § 51 broadly enough to encompass false light claims. *Id.* at 381, 384–85, 87 S.Ct. at 538, 540. In *Time, Inc. v. Hill, Life* magazine had printed a story stating that the play, *The Desparate Hours,* was a reenactment of the Hill family's highly publicized ordeal with a group of escaped convicts. While based on the incident, the play had fictionalized the event. New York courts granted recovery to Hill under § 51 based on *Life's* false statement that the play was a factual reenactment of the ordeal. The Supreme Court reversed holding that claims under New York's statute based on a fictitious or falsified report which would otherwise be privileged are

not actionable, absent proof of knowledge of falsity or reckless disregard of the truth. The Court stressed that where falsity is the gravamen of a § 51 claim, First Amendment guarantees permit imposition of liability only where actual malice is shown. *Id.* at 387–88, 87 S.Ct. at 541–42. As the Supreme Court said in *Time, Inc. v. Hill,* and later implied in *Zacchini v. Scripps-Howard Broadcasting, supra,* 433 U.S. at 573, 97 S.Ct. at 2856, it is essential to analyze "trade purposes" claims under § 51 to determine whether First Amendment concerns surrounding this false light tort are implicated. If not, the press is entitled only to the limited First Amendment protection afforded under *Zacchini.*

In examining the false light tort, we turn to section 652E of the Restatement (2d) of Torts that provides:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

■ Assuming the requisite proof of fault, the facts of this case state a cause of action under section 652E. The nude actress pictured was not Ms. Lerman. Whether or not this misidentification is defamatory to Ms. Lerman, *cf. McGraw v. Watkins,* 49 A.D.2d 958, 959, 373 N.Y.S.2d 663 (3d Dep't 1975) (film with nude scene of plaintiff "does not necessarily impute unchastity to plaintiff"), we cannot conclude that such publicity is not "highly offensive to a reasonable person." *See Arrington v. The New York Times, supra,* 55 N.Y.2d 433, 442, 449 N.Y.S.2d 941, 434 N.E.2d 1319

(taking and publishing plaintiff's picture without his knowledge or consent in connection with an article on the "Black Middle Class" was not "highly offensive to persons of ordinary sensibilities" under the Restatement § 652E formulation). Hence, if a false light claim under the Restatement rubric is recognized in New York, Ms. Lerman has stated a claim under it.[3]

In a false light case, however styled under a state statute or common law, the gravamen of the tort is falsity; not, as here, simply a factual error. Further, regardless of whether Ms. Lerman's cause of action is cast in terms of libel or false light or under the falsified trade purposes prong of § 51, the same constitutional protections apply. *See Meeropol v. Nizer,* 560 F.2d 1061, 1066 (2d Cir.1977) (rejecting Rosenberg children's claims that book about their parents had both defamed them and portrayed them in a false light), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). *Accord, Braun v. Flynt,* 726 F.2d 245, 250 (5th Cir.1984); *Rinsley v. Brandt,* 700 F.2d 1304, 1307 (10th Cir.1983); *Berry v. National Broadcasting Co.,* 480 F.2d 428, 431 (8th Cir.1973), *cert. dismissed,* 418 U.S. 911, 94 S.Ct. 3203, 41 L.Ed.2d 1157 (1974); *Dresbach v. Doubleday & Co.,* 518 F.Supp. 1285, 1288 (D.D.C.1981). Therefore, we must address the federal constitutional question to determine the appropriate standard of fault plaintiff should have been required to meet and to evaluate plaintiff's proof under that constitutional standard. In what follows we explain why plaintiff's proof falls short, defeating her cause against defendant.

### III *Constitutional Issues*

#### A. *Public or Private Figure*

To begin, the district court erroneously ruled in 1980 that the public figure question had application only to plaintiff's dismissed libel claim. Moreover, when Flynt

---

**3.** The district court addressed the June 1980 and January 1981 subscription solicitations and found in its June 3, 1982 decision they "would appear to fit squarely within the exception for advertising incidental to the news medium except that plaintiff was not properly and fairly

presented in the May 1980 issue of 'Adelina.'" 544 F.Supp. 971. Thus, the trial court implicitly recognized that the gravamen of plaintiff's complaint for those publications was grounded in false light, not commercial appropriation or right to publicity.

Distributing attempted to reopen this question on the remaining causes of action prior to trial, the district court refused to reconsider its earlier ruling. In our view the trial judge wrongly determined that Ms. Lerman was not a public figure under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and its progeny.

█ To decide whether Ms. Lerman is a public figure, we first consider the applicable rules. Discussion begins as it must with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There, the Court held that a state cannot award damages to a "public official" for a defamatory falsehood concerning his official conduct, absent proof that the statement was published with "actual malice." *Id.* at 279–80, 84 S.Ct. at 725–26. In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the same standard of proof for recovery under state libel laws was extended to plaintiffs who are "public figures." *Id.* at 162–63, 87 S.Ct. at 1995 (Warren, C.J., concurring). When a private individual seeks compensation for publication of a defamatory falsehood, the states may define for themselves the appropriate standard of fault, subject to the constitutional minimum of negligence. *Gertz v. Robert Welch, Inc., supra*, 418 U.S. at 347, 94 S.Ct. at 3010.

In rejecting the argument that Elmer Gertz, a reputable lawyer, was a public figure, the Court held that only those individuals who *voluntarily inject* themselves into a particular public controversy are considered limited purpose public figures, *id.* at 351–52, 94 S.Ct. at 3012–13. Emphasizing that the *New York Times* standard does not hinge on whether the statement concerns a matter of public interest, the Supreme Court held that a *cause celebre* divorce in Florida involving a prominent and wealthy couple was not a "public controversy." *Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1975). Moreover, the fact that Mrs. Firestone sought to obtain marital redress

through a court proceeding is not the kind of voluntary act or assumption of prominence in the resolution of public questions as to render her a "public figure." *Id.* at 454–55, 96 S.Ct. at 965. Four years later, the Court ruled that a person was not a public figure merely because he refused to appear before a grand jury, fully realizing that his refusal might attract publicity, because he was believed to have information of interest to the government relating to Soviet espionage. *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). Rather than thrusting himself to the forefront of the public controversy surrounding the extent of Soviet espionage in the United States, the petitioner in *Wolston* was dragged unwillingly into the controversy. *Id.* at 166, 99 S.Ct. at 2706. Again, becoming the recipient of Senator Proxmire's Golden Fleece Award as a result of the receipt of federal funds for research projects did not make plaintiff a limited public figure. *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). Although, like the petitioner in *Gertz*, Hutchinson was a writer for professional journals, he did not thrust himself or his views into the public eye to influence others, nor did he invite public attention or have regular and continuing access to the media. *Id.* at 135–36, 99 S.Ct. at 2688. The question in each case is what is "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 352, 94 S.Ct. at 3013; *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. at 167, 99 S.Ct. at 2707.

█ These holdings provide a frame to determine what constitutes a "limited purpose public figure." A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4)

maintained regular and continuing access to the media. Having ascertained what the basic test is, we apply it.

The record before us reveals that Ms. Lerman has achieved international renown as the author of nine novels. Her books are decidedly controversial in nature because of her firm conviction—made the focal point of her comments to the press—that there is a pervasive inequality in the treatment accorded to females vis-a-vis males. This topic greatly appeals to the public since her books sell in the millions, are full of descriptions of sex, including deviate sex and orgies, and are heavily laden with four-letter words. Ms. Lerman is quick to point out that some of her novels have been banned in Australia—a distinction similar to being banned in Boston. She has achieved a world-wide following, frequently appears as a guest on national TV and readily grants interviews to the mass media. On such occasions, one example of sexual inequality that Ms. Lerman uses refers to the fact that women more frequently than men appear unclad in films and magazines. This is unfair she claims because men have more opportunity to view undressed women than vice versa. She advocates "equal nudes for all."

Ms. Lerman's photograph is prominently displayed on the jackets of her novels that enjoy good reviews despite—or perhaps, because of—their description as "shocking," "racy," "sexy" and the like. She admits her books are considered "pornographic." Her first novel was translated into 32 languages. Movies have been made of several and, as earlier noted, the picture of the nude actress that is the subject of this litigation came from the film based on her novel "The World is Full of Married Men." Quite plainly Ms. Lerman is today in the forefront of women writing about sex and what is perceived of as a continuing double-standard in sexual mores. Thus, for plaintiff, seeking publicity both for herself and her books is part and parcel of her professional endeavors as a writer. The record plainly reflects her undoubted success in this effort. Her organized and ongoing effort to maintain media access, in order to call attention to her writings and disseminate her views on current sexual standards, helps to sell her novels and screenplays like the one "commented upon" in the May 1980 *Adelina*.

No doubt defendant has shown that plaintiff successfully invited public attention to her views and has maintained continuing access to the media. Nonetheless, we agree with the district court that Ms. Lerman is not that rare person the *Gertz* decision identifies as an all purpose public figure. As the Court there noted, "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 351–52, 94 S.Ct. at 3012–13.

■ But, we believe Ms. Lerman is a limited purpose public figure required to satisfy the *New York Times* standard of fault. By voluntarily devoting herself to the public's interest in sexual mores through extensive writing on this topic, reaping profits and wide notoriety for herself in the process, Ms. Lerman must be deemed to have purposefully surrendered part of what would otherwise have been her protectable privacy rights, at least those related in some way to her involvement in writing her books and screenplays. *See James v. Gannett Co.*, 40 N.Y.2d 415, 423, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976) ("The essential element underlying the category of public figures is that the publicized person has taken an affirmative step to attract public attention").

The difficult question is whether Ms. Lerman injected herself into a "public controversy" related to the offending publication. The district court rejected defendants' argument that Ms. Lerman was a public figure for the limited purpose of commenting on sex and nudity in films. The court reasoned that such a topic is merely a matter of interest, but not a true public controversy. We disagree. The relations between the sexes and public nudity

are topics of continued and general public interest and may be considered "public controversies" even though not involving political debate or criticism of public officials. A public "controversy" is any topic upon which sizeable segments of society have different, strongly held views. Certainly various groups today have vastly divergent views on the propriety of female or male nudity in films and in the print media generally. In the public controversies that daily swirl about—be they politics, pocketbook issues, or, as here, contemporary standards regarding nudity—some plunge into the arena and enter the fray. Plaintiff, as a controversial, outspoken authoress and screenwriter advocating equal nudity, was such a willing participant in this public controversy. Other similarly situated individuals have been held to be limited purpose public figures, *Rose v. Koch*, 278 Minn. 235, 154 N.W.2d 409, 426 (1967) (a well-known author); *Maule v. NYM Corp.*, 76 A.D.2d 58, 62, 429 N.Y.S.2d 891 (1st Dep't 1980) (writer for *Sports Illustrated*), *rev'd on other grounds*, 54 N.Y.2d 880, 444 N.Y.S.2d 909, 429 N.E.2d 416 (1981); *Atkins v. Friedman*, 49 A.D.2d 852, 374 N.Y. S.2d 11 (1st Dep't 1975) (physician who wrote books on dieting). We conclude therefore that plaintiff must be held to be a limited purpose public figure. *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 592 (1st Cir.1980); *Reliance Insurance Co. v. Barron's*, 442 F.Supp. 1341, 1346 (S.D.N.Y.1977).

### B. *Newsworthiness for First Amendment Purposes*

The district court adopted plaintiff's argument that an actual malice standard of fault does not apply even if plaintiff is a public figure because the use was "completely exploitive" and outside the broad category of matters of public interest and therefore not newsworthy. This led it erroneously to conclude that the distributor could be held strictly liable for disseminating the magazine without treading on the First Amendment. On the contrary, *Adelina* falls far short of crossing the line that would cause it to forfeit First Amendment protection. It contains no obscenity, *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), child pornography, *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), or matters inciting to riot, *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). The factual error in this case would be actionable only if the distribution of *Adelina* loses First Amendment protection under a standard analogous to that which causes libelous speech to lose such protection. *See Beauharnais v. Illinois*, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919 (1952). We cannot accept a view that a publication must meet an independent standard of newsworthiness to stand under the umbrella of First Amendment protection. Even "vulgar" publications are entitled to such guarantees. *Winters v. New York*, 333 U.S. 507, 518, 68 S.Ct. 665, 671, 92 L.Ed. 840 (1948). It makes no difference that *Adelina* may have few redeeming features, that it may express a point of view far afield from what one might consider the community's standard of decency, or that an ordinary reader may find it distasteful. The compass of the First Amendment covers a vast spectrum of tastes, views, ideas and expressions. *Pring v. Penthouse International, Ltd.*, 695 F.2d 438, 443 (10th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983). *Accord, Jenkins v. Dell Publishing Co.*, 251 F.2d 447, 451 (3d Cir.), *cert. denied*, 357 U.S. 921, 78 S.Ct. 1362, 2 L.Ed.2d 1365 (1958); *Goelet v. Confidential, Inc.*, 5 A.D.2d 226, 229, 171 N.Y.S.2d 223 (1st Dep't 1958) (magazine capitalizing on intimate details of lives of prominent individuals). To hold otherwise would draw a tight noose around the throat of public discussion choking off media First Amendment rights.

The *Adelina* article unquestionably would have been within the broad definition of a newsworthy matter or a matter of public interest or concern had Ms. Lerman in fact been the "starlet" pictured. *Ann Margret v. High Society*, 498 F.Supp. 401,

405 (S.D.N.Y.1980); *Davis v. High Society, supra,* 90 A.D.2d at 383, 457 N.Y.S.2d 308. That there was a factual error does not alter the subject matter of the offending publication. As noted earlier, New York law must yield in this context to First Amendment concerns which protect the media from liability for such errors, absent proof of fault. Courts are, and should be, reluctant to attempt to define newsworthiness. *Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 477 N.Y.S.2d 82, 465 N.E.2d 802 (1984). The Supreme Court in *Gertz* expressly warned against "committing this task to the conscience of judges." *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 346, 94 S.Ct. at 3010. *Cf. Regan v. Time, Inc.,* — U.S. —, — – —, 104 S.Ct. 3262, 3265–69, 82 L.Ed.2d 487 (1984) (nor should the task be undertaken by legislators since a statute that attempts to prohibit reproductions of United States obligations unless made for newsworthy purposes is held violative of the First Amendment). Rather, the factual error is only actionable against defendant distributor if made with the *Gertz* required fault. What then is the appropriate standard of fault in cases involving distributors?

### C. *Proof of Actual Malice*

#### 1. *Actual Malice of Distributors*

First Amendment guarantees have long been recognized as protecting distributors of publications. *Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959); *Winters v. New York, supra,* 333 U.S. at 509, 68 S.Ct. at 667; *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1937); *Ex Parte Jackson,* 96 U.S. (6 Otto) 727, 733, 24 L.Ed. 877 (1877) ("Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.") Whether a distributor is held liable for false and defamatory matter or for false matter invading privacy, the imposition of liability without adequate proof of fault would unquestionably chill the exercise of distributors' First Amendment rights. *See Time, Inc. v. Hill, supra,* 385 U.S. at 388–

89, 87 S.Ct. at 542; *Geiger v. Dell Publ. Co.,* 719 F.2d 515, 518 (1st Cir.1983); *Bargar v. Playboy Enterprise, Inc.,* 564 F.Supp. 1151, 1157 (N.D.Cal.1983).

 Obviously, the national distributor of hundreds of periodicals has no duty to monitor each issue of every periodical it distributes. Such a rule would be an impermissible burden on the First Amendment. At the same time a distributor as an integral part of the movement of information from the creator to the reader—the distributor here was to receive 46% of the profit from the sale of the magazine—cannot be entirely immune from liability. When a distributor acts with the requisite scienter in distributing materials defaming or invading the privacy of a private figure it must be subject to liability. *Lewis v. Time, Inc.,* 83 F.R.D. 455, 464 (E.D.Cal. 1979). *See Suarez v. Underwood,* 103 Misc.2d 445, 447, 426 N.Y.S.2d 208 (Queens Cty. Sup.Ct.1980), *aff'd,* 84 A.D.2d 787, 449 N.Y.S.2d 438 (2d Dep't 1981). But, a public figure plaintiff may only recover compensatory damages where a distributor acts with "actual malice," and no plaintiff—public figure or private individual—may recover punitive damages unless the *New York Times v. Sullivan* standard is met.

 To have acted with constitutional or actual malice, the defendant must be shown to have had "a high degree of awareness of [the statement's] probable falsity," *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), or to have "in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). *See also Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 335–36, 94 S.Ct. at 3005 ("subjective awareness of probable falsity"). The essential inquiry is whether those in charge of Flynt Distributing had serious doubts about the accuracy of the identification of Ms. Lerman in *Adelina. See Pep v. Newsweek,* 553 F.Supp. 1000 (S.D.N.Y.1983); *Pirre v. Printing Developments, Inc.,* 468 F.Supp. 1028, 1038–

39 (S.D.N.Y.1979). *See also Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024, 1026 (5th Cir.1975) (actual malice "is not a proposition that can be supported by a normative conclusion that the publisher should have known of the falsity of the statement"). Inasmuch as the district court failed to instruct the jury that it must find Flynt Distributing to have acted with actual malice, the jury's verdicts must be reversed. Nevertheless, since the record is complete with regard to Flynt Distributing's knowledge and conduct, both of which are necessary to prove a "knowing use" for punitive damages under § 51, we examine the evidence to determine whether a new trial is warranted.

### 2. *Actual Malice in This Case*

Although the trial court granted the plaintiff's motion for summary judgment and did not instruct the jury on actual malice, it did put Ms. Lerman on notice of the need for her to prove a "knowing use" under the statute itself. Thus, plaintiff and her experienced counsel had every incentive to uncover facts during discovery and to present evidence at trial showing Flynt Distributing's knowledge or reckless disregard of the publisher's false report concerning Ms. Lerman. Such evidence of "knowing use" is identical to the evidence of actual malice. Accordingly, we "make an independent examination of the whole record 'in order to make sure that a [verdict finding actual malice] would not constitute a forbidden intrusion on the field of free expression.'" *Bose Corporation v. Consumers Union of United States,* —— U.S. ——, ——, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting *New York Times v. Sullivan, supra* ). *See Time v. Pape,* 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45 (1971); *Hunt v. Liberty Lobby,* 720 F.2d 631, 643 (11th Cir.1983); *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *Buckley v. Littell,* 539 F.2d 882, 888 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). While that constitutional duty does not permit us to substitute

our views for legitimate jury findings, *see Time, Inc. v. Hill, supra,* 385 U.S. at 394 n. 11, 87 S.Ct. at 545 n. 11, it does require us to scrutinize the record closely. The question to decide is whether the trial judge should have granted summary judgment to the defendant based on the lack of evidence of actual malice.

■ In the first place, plaintiff failed to offer proof sufficient even to impose a duty on defendant Flynt Distributing to inquire as to the May 1980 issue and the district court specifically found that there was no "knowing" use under § 51 by defendant of plaintiff's name in that issue. Further, there was no proof that any of defendant's employees had reason to believe that Chuckleberry (the publisher) would misidentify Ms. Lerman as the actress pictured. Because we have determined that plaintiff is a limited purpose public figure required to prove actual malice for compensatory damages, the claim arising from the May 1980 issue must be dismissed.

Similarly, with respect to the June 1980 and January 1981 issues there is no evidence in the record showing that Flynt Distributing knew or recklessly disregarded whether these editions contained any mention of plaintiff, let alone any factual error concerning her. As noted, "actual malice" as is implied in that expression is a subjective test focused on defendant's state of mind. *See Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979). Flynt Distributing may be held liable only if plaintiff presented clear and convincing evidence that some high level employee of the corporation acted with reckless disregard of the fact that false matter had been published by Chuckleberry. The only evidence pointing in that direction is the conceded fact that Flynt Distributing knew of plaintiff's lawsuit against Chuckleberry and Publishers Distributing for the May 1980 issue, plus a claimed failure thereafter by it to investigate. Plaintiff cites no other evidence in her brief, and careful examination of the voluminous record in this case reveals none.

Absent are any facts demonstrating that anyone in the defendant distributing company had a subjective awareness of probable falsity. Notice of the lawsuit regarding the May issue standing alone certainly is not clear and convincing evidence as to knowledge for June and January, especially given the miniscule mention of plaintiff in those issues. Moreover, mere failure to investigate, while relevant, is also not itself sufficient to show actual malice. *See Hotchner v. Castillo-Puche, supra,* 551 F.2d at 913; *Washington Post Co. v. Keogh,* 365 F.2d 965, 971 (D.C.Cir. 1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). Failure to investigate is an especially weak criterion in the case of a distributor of hundreds of publications. While distributors may know something of the contents of publications that they contract to distribute, there is ordinarily little reason for them to examine the scores of magazines distributed. In sum, there is simply no evidence—which plaintiff had every incentive to develop to obtain punitive damages—that any Flynt Distributing employee was aware that the publisher's errors would reoccur. Consequently, we hold as a matter of law that a properly instructed jury could not fairly and rationally conclude upon clear and convincing evidence that this defendant's uses were knowing or made with actual malice.

## IV *The Damage Awards*

The jury awarded plaintiff a total of seven million dollars in compensatory damages, which the trial court refused to reduce. No doubt such an enormous verdict chills media First Amendment rights. But a verdict of this size does more than chill an individual defendant's rights, it deepfreezes that particular media defendant permanently. Putting aside First Amendment implications of "megaverdicts" frequently imposed by juries in media cases, the compensatory damages awarded shock the conscience of this Court. They are grossly excessive and obviously a product of plaintiff's counsel's appeals to the passion and prejudice of the jury. It cannot seriously be contended that Ms. Lerman's

lacerated feelings are worth anything close to $7 million. No proof was offered that she sought or needed professional help because of these publications and the fact she completed a novel between March and September in 1980 refutes her contention that she was unable to work. In any event, damages under the New York statute often are only nominal since they are designed primarily to compensate for injury to feelings. *See Lombardo v. Doyle, Dane and Bernbach, Inc.,* 58 A.D.2d 620, 621, 396 N.Y.S.2d 661 (2d Dep't 1977). Applying California law on facts somewhat analogous to those in the instant case, $25,000 was found to be "substantial compensation for mental anguish." *Clark v. Celeb. Publ. Inc.,* 530 F.Supp. 979, 983 (S.D.N.Y. 1981). *See also Pirre v. Printing Development, Inc.,* 468 F.Supp. 1028, 1038 (S.D.N.Y.1979) (extremely sensitive plaintiff entitled to no more than $45,000 for mental anguish); *Myers v. U.S. Camera Publ. Corp.,* 9 Misc.2d 765, 768, 167 N.Y.S.2d 771 (1957) ($1500 total damages for publishing unauthorized full body nude photograph of plaintiff).

Finally, we note that reputational damage to Ms. Lerman could not have been great. Only the readers of *Adelina,* a magazine of relatively modest circulation that Ms. Lerman describes as "sordid" and "obscene" would have seen the offending material. In fact, given the number of famous persons portrayed in this fashion, one wonders whether such pictures are even capable of producing genuine reputational harm. Even assuming the word would get around to those whose esteem of plaintiff would be diminished, the main source of publicity for the pictures came not from the magazine's publication, but from Ms. Lerman's lawsuit and statements to the press.

The jury also awarded a total of $33 million in punitive damages, more than plaintiff demanded in her complaint and over six times greater than plaintiff's counsel requested in this summation. This award also shocks our conscience and rein-

forces our conclusion that the verdicts represent appeals to passion or prejudice.

## V CONCLUSION

The availability of damages depends on plaintiff's ability to satisfy the actual malice standard of *New York Times v. Sullivan* that plaintiff as a limited purpose public figure was required to meet. Since Ms. Lerman cannot present clear and convincing evidence of defendant's requisite fault with respect to the factual error disseminated, the judgment awarding her ten million dollars in compensatory and punitive damages is reversed as a matter of law and her complaint against Flynt Distributing is dismissed.

BONSAL, District Judge, concurring and dissenting.

I concur in much of the majority's excellent opinion. I agree that the plaintiff must be considered a limited purpose public figure who has voluntarily injected herself into an on-going controversy through her writings and media appearances. I also agree with the majority that the case of *Davis v. High Society Magazine, Inc.*, 90 A.D.2d 374, 457 N.Y.S.2d 308 (2d Dept. 1982) is "strikingly similar to this one." In *Davis*, as here, the trial court granted summary judgment for the plaintiff without considering whether the defendant had acted with actual malice. The Appellate Division held that, as a limited purpose public figure, the plaintiff had to establish that the defendant had acted with actual malice in order to recover under New York Civil Rights Law § 51. Finding insufficient evidence in the record to establish that the defendant had acted with actual malice, it reversed the trial court's grant of summary judgment, stating:

> [T]here is an element of plaintiff's cause of action which is in dispute and which cannot be resolved on this motion. It is incumbent upon plaintiff to prove at trial that defendants published the subject issue of *Celebrity Skin* with actual malice .... *Davis*, at 383, 457 N.Y.S.2d 308.

The court in *Davis* noted that "[t]he existence or absence of actual malice 'does not lend itself to summary disposition' since it pertains to 'a defendant's state of mind.'" *Davis*, at 384, 457 N.Y.S.2d 308 (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979)).

While I agree with the majority that the plaintiff here has a heavy burden to establish actual malice, I do not think that is sufficient reason to deny her the opportunity to do so. Therefore, I would remand the case to the trial court to give her an opportunity for further discovery and a trial on the issue of actual malice—whether defendant acted with knowledge of falsity or in reckless disregard of the truth.