Robert C. GUCCIONE, Plaintiff,

v.

HUSTLER MAGAZINE, INC. and Flynt
Distributing Company, Inc.,
Defendants.

No. 83 Civ. 8020 (RWS).

United States District Court,
S.D. New York.

March 19, 1986.

Grutman, Miller, Greenspoon, Hendler & Levin, New York City, for plaintiff Robert C. Guccione; Norman Roy Grutman, Jeffrey H. Daichman, Thomas V. Marino, of counsel.

Anderson, Russell, Kill & Olick, P.C., New York City, for defendant Flynt Distributing Co., Inc.; John H. Gross, Ann V. Kramer, James L. Garrity, Jr., Steven Cooper, of counsel.

Cooper, Epstein & Hurewitz, Beverly Hills, Cal., for defendant Hustler Magazine, Inc.; Alan K. Isaacman, David O. Carson, of counsel.

### OPINION

SWEET, District Judge.

Defendants Hustler Magazine, Inc. ("HMI") and Flynt Distributing Company, Inc. ("FDC") have brought a motion, pursuant to Rules 50(b) and 59(b), Fed.R.Civ.P., for judgment notwithstanding the verdict, or, in the alternative, for a new trial. Judgment was entered on October 17, 1985 following the bifurcated trial of this libel action brought by Robert Guccione ("Guccione"), among other things, the publisher of Penthouse, Inc. The jury awarded Guccione $1.00 in compensatory damages and a total of $1.6 million in punitive damages of which $900,000 was assessed against HMI and $600,000 against FDC. For the reasons set forth below, the defendants' motions will be denied.

### I. Framework of the Litigation

This diversity action was initially brought by Guccione and Penthouse, Inc., alleging defamation, invasion of privacy and copyright infringement for the publication of a photograph and article in the November, 1983 issue of *Hustler* maga-

zine, a national magazine with an avid readership. The defendants named in the complaint were Larry Flynt ("Flynt"), HMI and FDC. This action is one of several actions filed by Guccione in response to unfavorable publications which have appeared in *Hustler*, the most significant action being a libel suit in Ohio in which a jury verdict was rendered against Flynt and HMI in the amount of $40 million. This verdict was affirmed with respect to the liability of Flynt' and HMI while reversed as to the damages.

The course of the instant litigation has been mapped by the earlier opinions dated April 17, 1984, June 1, 1984, February 1, 1985, August 16, 1985, and September 17, 1985. During this pretrial period, the complaint against Flynt was dismissed for lack of personal jurisdiction in New York and the causes of action for invasion of privacy and copyright infringement were dismissed. The defendants also sought to dismiss the libel claim in two motions for summary judgment in which they asserted the absence of actual malice and the substantial truth of the publication. The summary judgment motions, brought respectively at the inception and conclusion of discovery, were each denied.

The trial was conducted during two weeks in September, 1985 at which time further motions were asserted and briefed on a daily basis. As noted above, judgment was entered against the defendants for a total of $1.6 million in punitive damages. Following the trial, the parties have contested the execution of judgment, and execution has been stayed to permit the defendants to pursue post trial and appellate remedies upon the posting of a bond in the reduced amount of $400,000. According to the defendants, a greater bond would have destroyed their ability to continue operations. The amount of the bond has been the subject of continuing discovery. Finally, the defendants brought the present motions which were submitted after oral argument on November 22, 1985.

A considerable amount of time, energy, and money has been expended by counsel by both sides to bring this grudge match to this court. Their ingenuity and skill has required an equivalent effort by the court to obtain a resolution. Contrary to some recent libel actions in this court, the issues presented are not of commanding public interest but rather highly personal.

## II. The Libelous Statement and Applicable Standards

The short article in *Hustler* contained the following false statement which forms the basis for this libel action: "Considering he is married and has a live-in girlfriend, Kathy Keeton, ... we wonder if he [Guccione] would let either of them pose nude with a man." This statement was false when published in November, 1983 since it is uncontested that Guccione obtained a divorce from his wife in 1979 and has not subsequently remarried.

### A) Libel Per Se

As determined at trial, the above statement includes a specific accusation that Guccione was engaged in an adulterous relationship since the reference to a "live-in girlfriend" implies a sexual relationship outside of marriage. As such, the false statement lies within that category of libel *per se* as defined under New York law. Libel *per se* provides a unique right of action for those statements that "tend[ ] to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or include an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977). Words that impute the commission of an indictable offense comprise one category of libel *per se* under New York law. *See Moore v. Francis*, 121 N.Y. 199, 202–03, 23 N.E. 1127 (1890); *Privitera v. Town of Phelps*, 79 A.D.2d 1, 435 N.Y.S.2d 402, 404 (1981). Under New York law, "[a] person is guilty of adultery when he engages in sexual intercourse with another person at a time when he has a living spouse...." N.Y.Penal Law § 255.17

(McKinney's 1967). As found by the court at trial, the statement charging that Guccione had a "live-in girlfriend" implies that he was engaged in sexual intercourse with someone other than his spouse and therefore the statement does charge the commission of a crime.

■ The defendants urge that, while adultery is an indictable crime, such an offense is so commonplace and so infrequently enforced that it should not be considered a crime for the purposes of libel law. This argument, however, finds no support from the applicable New York authorities. *See Matherson v. Marchello,* 100 A.D.2d 233, 473 N.Y.S.2d 998, 1004 (1984); *Jordan v. Lewis,* 20 A.D.2d 773, 247 N.Y.S.2d 650, 651 (1964); *Bergmann v. Jacobs,* 157 N.Y.S.2d 50, 51–52 (N.Y.Sup. Ct.1956). These cases do not suggest that the crime of adultery is so insignificant that such an accusation fails to support an action for libel *per se.* Therefore, until either the courts or legislature of New York indicate otherwise, this court is bound to accept Guccione's complaint as an appropriate pleading under the doctrine of libel *per se.* The consequence of this holding, critical to this action, is that Guccione is not required to prove special damages, *i.e.* actual damage to his reputation, in order to maintain this action. *See Matherson, supra,* 473 N.Y.S.2d at 1000–01; *Wachs v. Winter,* 569 F.Supp. 1438, 1443 (E.D.N.Y. 1983). That is fortunate for Guccione who failed to establish any such damages.

### B) Public Figures

As explained in the June 1, 1984 opinion, Guccione was found to be a public figure in his libel suit in Ohio and therefore would be collaterally estopped from claiming otherwise here. Since he has also conceded that he is a public figure, there is no question that he must meet the stringent standard of proving actual malice to recover for the false statement. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

### III. Judicial Review of Actual Malice

■ The First Amendment concerns present in this libel action alter the usual presumptions adopted when considering a motion for judgment notwithstanding the verdict. Just as an appellate court has an obligation to make an independent review of the trial record to ensure that there has been no unconstitutional intrusion on free expression, *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1965–66, 80 L.Ed.2d 502 (1984), so the trial court must reexamine the evidence when presented with a motion for judgment n.o.v. It is necessary therefore for "[j]udges, as expositors of the Constitution, [to] independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Id.* at 511, 104 S.Ct. at 1965; *see Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 230 (2d Cir.1985).

### A. Evidence Admitted at Trial

At trial Guccione presented evidence which tended to demonstrate both components of the actual malice standard: that the defendants actually knew that the statement was false and alternatively that the defendants published the statement in reckless disregard of its truth or falsity.

The evidence established that Flynt, the publisher of HMI, had created the article which contained the libelous statement. The article appeared in the "Bits and Pieces" section of the magazine and by deposition testimony, Bruce Helford, the editor responsible for the "Bits and Pieces" section, testified that Flynt had given him the article at an editorial meeting with instructions to include it in the November, 1983 issue of *Hustler.* Flynt testified that he wrote all of the article with the exception of certain changes that were made by the editorial and legal department. The legal department personnel who reviewed the article included David Kahn ("Kahn"),

general counsel for HMI and Neil Adelman ("Adelman"), assistant general counsel.

Helford testified that at the time when the article was first handed to him by Flynt, he was unsure whether it could be included in the November issue since that issue had already been laid out and prepared for publication. He stated that after being told by the production department that the article could be included, the preparation of the article was done in a "big rush" and was finished within one day. Helford and another editor, Richard Lewis, testified that HMI had a policy of verifying information published in the magazine and that they employed four people in the HMI research department who checked the accuracy of proposed articles. However, the article containing the false statement was never forwarded to the research department for verification.

Helford, while he prepared the article for proper publication format, did not have any input with regard to the substance of the article. Helford did testify that he attended a meeting with Flynt and Kahn in which Kahn suggested alterations in the text. Both Kahn and Adelman testified that they reviewed the article and proposed changes in several sentences of the article.

There was no testimony to indicate that the single statement at issue in this case was ever discussed by Flynt, Kahn and Adelman in the course of revising the article. Thus, there was no direct testimony that these participants considered the implications or veracity of the statement. On one intermediate draft of the article, the statement was underlined which indicates that it was reviewed by someone, however, there was no testimony which revealed any significance to the underlining.

Each of the three involved in the drafting —Flynt, Kahn and Adelman—asserted that they believed at the time they wrote the article that Guccione was married to Muriel Guccione and that he was living with Kathy Keeton, thus claiming a good faith belief in the statement. Flynt stated that he had read articles in magazines which stated that Guccione was married. He also testified that he was friends with Irwin Billman and Jim Goode, two former executives of Penthouse Magazine who were employees of Guccione. Flynt asserted that these men had informed him that Guccione was married and never told him about any divorce. According to Flynt's testimony, his discussions with Goode extended for about one week and during these conversations Goode informed him that Guccione was promiscuous. As explained by Lewis, an HMI editor, Flynt's discussions with Goode were undertaken in early 1983 pursuant to Flynt's desire to publish an investigative article examining Guccione's business and personal life. This proposal was apparently abandoned after Goode told Flynt that while willing to provide sources and information, he was not interested in writing the article.

Flynt's testimony setting forth the sources for his statement was undermined by inconsistent answers given in response to pretrial interrogatories. At that time, Flynt did not mention any of these particular sources but instead responded that the facts regarding Guccione's marital status and girlfriend were "common knowledge in the news magazine industry and most likely in the general public." Adelman and Kahn testified that their understanding of Guccione's marital status was based on unspecified discussions and articles. Kahn did testify that he had read an interview given by Guccione in which he recalled that Guccione stated he had been living with Keeton for ten or fifteen years. Circumstantial evidence in support of the professed beliefs of Flynt, Kahn and Adelman was provided by the testimony of Guccione. He admitted that he had lived openly with Keeton since 1966, that he spoke to the press about his relationship, and therefore he considered that their relationship was known to the public.

On the other hand, circumstantial evidence was presented to demonstrate that Flynt, Kahn and Adelman were actually aware of Guccione's divorce from his wife in 1979 and therefore aware of the falsity of the statement. In 1980, a prior libel

action brought by Guccione against Flynt was tried in Ohio State Court. During this trial, Guccione testified that he had obtained a divorce from his former wife Muriel Guccione. The Ohio proceedings were televised, and Flynt was present in Ohio during the trial. Although there was no direct testimony that Flynt saw Guccione's testimony, such an inference could fairly have been reached by the jury.

Following the trial in Ohio, the local counsel for Flynt and HMI took the deposition of Muriel Guccione on December 18, 1980. At this deposition she also stated at the beginning of her testimony that she was divorced from Guccione. There was no direct evidence that any of the defendants' attorneys who attended this deposition, including Duncan Darrow who has provided continuing outside counsel to HMI, communicated any knowledge about Guccione's divorce to Flynt, Adelman and Kahn. Nevertheless, the record of this proceeding, together with the rest of the Ohio trial record, was available in the HMI legal department headed by Adelman and Kahn. These men admitted that they had read parts of the trial record in preparation for the filing of appeals from the Ohio jury verdict against Flynt. Thus it would be possible to infer their actual knowledge of the testimony given by Guccione and his former wife. This inference with regard to Adelman's state of mind is buttressed by his testimony that he had a strong interest in Guccione and generally was attentive to any information regarding Guccione's activities.

The evidence cited above was probative of whether or not the defendants actually knew of the falsity of their statement. There was additional evidence to support the jury verdict based on the other standard for actual malice, that of reckless disregard for the truth or falsity of the statement. Prior deposition testimony of Flynt and prior publications of HMI were admitted to demonstrate that the statement was published with reckless disregard.

The prior publications of HMI indicated the ill will between the parties. Over a nine year period, Flynt was responsible for several publications in *Hustler* which demonstrated his hostility towards Guccione. These publications included references to Guccione as having a sex change operation, having a venereal disease and engaging in homosexual acts. One of these publications was the subject of the libel suit in Ohio in which a verdict was rendered against Flynt and HMI. HMI also published derogatory depictions of Keeton during the time period of her relationship with Guccione.

In addition to the tangible evidence of Flynt's hostile publications directed against Guccione, there was additional evidence of Flynt's subjective disregard for the truth of statements published by him. In deposition testimony given in another case, but closely related to the time period in which the libelous statement was published, Flynt responded: "I don't care" and "I didn't care" when questioned about a publisher's rights to print false statements. In that deposition, which was read to the jury here, the following colloquy also occurred:

Q: Do you think with respect to adults you can say anything you want about their private sexual activities, whether it's real or fancied or not?

A: Yes.

Q: No matter how horrible it may be to the average ordinary person?

A: Yes.

Q: And you think you can do that in a magazine and get away with it, don't you?

A: Yes.

These admissions by an agent of the defendants, together with the lack of any specific source for the article, the animosity towards Guccione, and the rush to print the article within one day, were together probative of whether the statement was published in reckless disregard of its truth or falsity.

**B. Admissibility of Evidence**

Defendants objected to the introduction of evidence of prior publications relating to Keeton and Guccione and to the use of

prior deposition testimony of Flynt on cross-examination. Each of these objections is unfounded.

 The previously published excerpts in HMI relating to Keeton were relevant to this litigation since they displayed the close attention and interest of HMI in the relationship between Guccione and Keeton, a relationship that was the subject of the libelous statement. Despite their offensive nature, the relevance of these excerpts was not outweighed by any prejudice. Indeed it was just the offensive nature of these publications which were similar to others, which gave rise to the implication of the defendant's motive to publish false statements.

 In deposition testimony which was used to cross-examine Flynt, several statements were admitted that tended to demonstrate Flynt's own disregard for the truth or falsity of the material in his publications. Also admitted was prior deposition testimony in which Flynt claimed to have bribed a judge. While the defendants object on the basis that Flynt was not competent during those depositions by virtue of a manic-depressive condition, no finding of incompetence was ever made by the courts in which that deposition testimony was originally proffered.

 The prior deposition testimony was properly admitted both on the basis of attacking the credibility of the witness Flynt, Fed.R.Evid. § 608(b), and as a prior admission by a representative of a party opponent. Fed.R.Evid. § 801(d)(2)(D). The time period of the prior statements was closely related to publication at issue here. The content of the statements was relevant in casting doubt on the credibility of Flynt's assertions that the instant publication was made in good faith and more generally with regard to this particular executives' subjective intent with regard to publishing at that time period. Furthermore, these statements were made by Flynt within the scope of his authority as chief executive of both HMI and FDC and therefore are admissible as admissions by the defendants. *See Meschino v. International Telephone & Telegraph Corp.*, 563 F.Supp. 1066, 1072 (S.D.N.Y.1983); *see also Astra Pharmaceutical Products, Inc. v. Occupational Safety and Health Review Comm'n*, 681 F.2d 69, 73 n. 8 (1st Cir. 1982); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(D)[01] (1985).

## C. Sufficiency of the Evidence

 The evidence outlined above is sufficient to establish with convincing clarity that the defamatory statement was published by HMI and FDC with actual malice. A determination of actual malice requires the finding that the defendants published the statement either with actual knowledge of its falsity or in reckless disregard of its probable falsity. *See New York Times Co. v. Sullivan, supra.*

 While the defendants' subjective awareness of the truth or falsity is central to the question of actual malice, *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), a defendant may not foreclose a libel action merely by his repeated assertions that he believed the truth of his statements at the time of publication. This direct evidence may be rejected by the jury if there is adequate circumstantial evidence which indicates that the defendant may have known of the falsity of his statements. *See Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979) (proof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred); *Bose Corp. v. Consumers Union of U.S., Inc.*, 692 F.2d 189, 196 (1st Cir.1982), *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (subjective determination of whether defendant in fact entertained serious doubts as to the truth of statement may be proved by inference, as it would be rare for a defendant to admit such doubts). The evidence in this case involved just such a conflict between the direct and circumstantial evidence regarding the state of mind of defendants.

■ While the executive officers and editors of HMI and FDC firmly testified to their belief in the truth of the libelous statement, circumstantial evidence to the contrary has been stated to indicate their awareness of Guccione's affairs in general as well as access to the particular statements of his true marital status in the Ohio litigation and their expressed motivations. On the basis of this circumstantial evidence, the jury could have found that Flynt, Adelman or Kahn actually knew about Guccione's divorce.

The evidence of the defendants' recklessness is more direct and for that reason stronger. The evidence regarding Flynt's malicious ill-will towards Guccione was properly admitted as one facet of the circumstantial evidence against the defendants relevant to a finding of reckless disregard for the truth. While "neither negligence nor failure to investigate, on the one hand, nor ill-will, bias, spite nor prejudice, on the other, standing alone, [are] sufficient to establish either a knowledge of the falsity of, or a reckless disregard of, the truth or falsity of the materials used . . .[,] evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity." *Goldwater v. Ginzberg,* 414 F.2d 324, 342 (2d Cir.1969).

■ Hostility, of course, is not itself a sufficient basis for establishing constitutional malice in a First Amendment case since such an inference might result in liability based on the stridency of the statements rather than the reckless absence of factual support. Thus, the Supreme Court has cautioned against any definition of actual malice which blurs the distinction between hostility and knowing or reckless falsity as to the publication at issue. *See Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 90 S.Ct. 1237, 26 L.Ed.2d 6 (1970), and hopefully the proper instruction was provided to the jury on this issue. Nevertheless, this distinction does not make the evidence of prior HMI publications which demonstrate ill will irrelevant to the determination of actual malice. Under the case law of this Circuit, *see Goldwater, supra,* it is appropriate to consider hostility under certain circumstances as evidence of the defendants' motive to publish harmful statements without regard to their truth or falsity. The most recent case to confront the issue of ill will, while lacking precedential value, is also instructive. *See Tavoulareas v. Piro,* 759 F.2d 90, *vacated and rehearing en banc granted,* 763 F.2d 1472 (D.C.Cir.1985).

The majority opinion in *Tavoulareas* concluded that the defendant's predetermined bias or ill will against the plaintiff should be considered appropriate evidence of a reckless disregard for the truth. The court recognized that while ill will does not constitute an element of actual malice, it is nevertheless relevant as tending to prove an element of the standards for constitutional malice. Even without embracing the entire reach of the majority's opinion, the evidence of ill will by those of HMI and FDC was appropriately admitted. Unlike that case, here there were no fine shadings of opinion to be considered, no need to characterize the publisher's policy of hard-hitting investigative journalism, nor to consider whether an ambitious young journalist may be more prone to false reporting. *See Tavoulareas, supra,* 759 F.2d at 117–21. Instead, the personal animus between Flynt and Guccione provides a direct motive to falsify which is not otherwise linked to any journalistic policy or practice. In fact, while vigorously objecting to the majority's characterization of the newspaper's policies and urging the complete exclusion of ill will as evidence in a libel suit, the dissent in *Tavoulareas* stated that on those occasions where it is appropriate to admit ill will, then a particular defendant's personal hostility towards the plaintiff may be admitted as evidence of his own reckless disregard for the truth. *See id.* at 156 (J. Wright, dissenting). This is such a case, if ever there was one.

In addition, there was no need to consider whether the defendants were permitted an appropriate range of editorial discretion, *see Time, Inc. v. Pape*, 401 U.S. 279, 286, 91 S.Ct. 633, 637, 28 L.Ed.2d 45 (1971), since in this case, the false statement was not merely a false characterization resulting from editorial revisions but rather was simply a blatant misstatement. This case did not involve an ambiguous source for which an editorial misstatement would be an understandable mistake. *See Pape, supra*, 401 U.S. at 292, 91 S.Ct. at 640; *Bartimo v. Horsemen's Benevolent and Protective Association*, 771 F.2d 894, 900 (5th Cir.1985). Thus, there was little risk that admitting evidence of ill will would prejudice First Amendment values.

■■■■ Finally, the evidence presented regarding HMI's failure to engage in any confirmation or investigation of Guccione's marital status under the circumstances corroborated other evidence of the defendants' reckless disregard for the truth or falsity of the publication. Generally, of course, in the absence of any duty, the failure to investigate does not in itself establish bad faith. *St. Amant, supra*, 390 U.S. at 732–33, 88 S.Ct. at 1326–27. However, the lack of an investigation can cast doubt on a defendant's profession of good faith in light of the complete absence of a source for the information or the known unreliable nature of a source. *Id.* at 732, 88 S.Ct. at 1326, *see Pep v. Newsweek, Inc.*, 553 F.Supp. 1000, 1003 (S.D.N.Y.1983). Here no specific source for the article was identified, and Flynt claimed to have written the article based on what he termed "common knowledge." The evidence regarding HMI's lack of investigation into the story was relevant, since there was no specified source of the information published. *See generally Kerwick v. Orange County Publications Division of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 438 N.Y.S.2d 778, 420 N.E.2d 970 (1981); *Guam Federation of Teachers v. Ysrael*, 492 F.2d 438 (9th Cir.1974). Furthermore, the article was in no way "hot news" for which there was an urgent need to publish without time for verification. *See Curtis Publishing Co. v.*

*Butts*, 388 U.S. 130, 157, 87 S.Ct. 1975, 1992, 18 L.Ed.2d 1094 (1967).

■■■■ The present case is distinguished from the case law setting forth the elements of actual malice as a constitutional standard because of the unusual character of Flynt's recklessness and hostility towards Guccione. Due to evidence establishing that Flynt himself wrote the article with actual malice, the verdict is equally applicable to FDC in view of Flynt's relationship as the sole shareholder and chief executive for the company. Since there was adequate evidence on which the jury could reasonably find actual malice with convincing clarity, the liability verdict will not be overturned.

## IV. Substantial Truth

■■■■ HMI and FDC further assert that the court's instructions on the issue of substantial truth were improper in view of Guccione's concession that he lived with Keeton in an adulterous relationship from 1966 to the present. Substantial truth is an affirmative defense provided by New York law which provides that the omission or misstatement of "relatively minor details in an otherwise basically accurate account is not actionable." *Rinaldi, supra*, 42 N.Y.2d at 383, 399 N.Y.S.2d 943, 366 N.E.2d 1299.

■■■■ The doctrine of substantial truth was adequately reflected by the instructions submitted to the jury:

Guccione must also establish that the statement was false. If the statement is true or substantially true, it cannot be libelous. It's not necessary of course that a statement be literally true. The test is whether the statement, as it was published, had a different effect on the mind of the reader than the actual literal truth. The facts which are offered to support a claim of substantial truth must be as broad as the alleged libel. Therefore, you have to determine the scope of the alleged libel before you can determine whether or not the statement was substantially true.

Put another way, if you determine that the libel in question should be read as accusing Guccione of committing adultery only in 1983, the fact that Guccione might have committed adultery at another time is not going to make the statement substantially true. However, if you determine that the libel should only be read as accusing Guccione more generally of being an adulterer, you can then consider the evidence of Guccione's prior actions in relation to this issue of substantial truth.

(Tr. 1077–78). These instructions directed the jury to determine the scope of the alleged libelous statement and compare with the facts presented to determine whether the statement had a different effect on the mind of the reader than the actual literal truth. Thus the jury was squarely presented with the alternative of interpreting the defamatory statement as a general accusation of adultery or a specific accusation of committing adultery in 1983 at the time the statement was made. The opposing parties stressed each interpretation in their summations, and it was appropriately left for the jury whether the scope of the libelous statement was co-extensive with Guccione's previous adulterous relationship.

■ HMI and FDC, however, urge that the court erred by failing also to instruct the jury to compare the "gist" or "sting" of the libelous statement with that of a true statement. *See Westmoreland v. CBS*, No. 82 Civ. 7913 (S.D.N.Y.1985). Such an instruction would have been inappropriate because the statement constituted libel *per se*. As noted above, this special category of libel under New York law is reserved for those statements which are presumed by law to expose a person to public contempt or ridicule. Since the doctrine of libel *per se* is applicable to this publication, it would have been inappropriate to instruct the jury to weigh the "sting" or "gist" of the statement in order to determine whether the defendants' liability had been established. The existence of "sting" or damage is a conclusive presumption under the libel *per se* doctrine, *see*

*Davis v. Ross,* 107 F.R.D. 326, 330 n. 4 (S.D.N.Y.1985), and thus the law of New York does not require proof of special damages in actions based on libel *per se. See, e.g., Matherson, supra,* 473 N.Y.S.2d at 998.

## V. Libel-proof Defendant

■ HMI and FDC assert, relying on *Cardillo v. Doubleday & Co., Inc.,* 518 F.2d 638, 639–40 (2d Cir.1975), that Guccione's extensive earlier relationship with Keeton while he was married renders him libel-proof for any statement that falsely accused him of adultery with Keeton after his divorce decree was obtained. In *Cardillo,* this Circuit held that where a libel plaintiff has an extensive public record of felony convictions as well as public associations with other perpetrators of crime, he should not be permitted to bring a libel action based on accusations of similar criminal activity that are allegedly inaccurate.

Since the *Cardillo* libel proof doctrine has been "confined to its basic factual context," *Buckley v. Littell,* 539 F.2d 882, 889 (2d Cir.1976), it is significant to note the facts distinguishing that case from the present one. The public record of Cardillo's past reputation for criminal conduct was extensive. The Court noted that Cardillo had been convicted of numerous separate offenses in both federal and state courts, had been indicted on one of the offenses mentioned in the allegedly defamatory publication, and that his connections with organized crime were the subject of testimony before a congressional committee. *Id.* at 640. Similarly, in one of the few cases to follow *Cardillo's* holding, it was found that the plaintiff had been convicted on several separate occasions and that numerous previous articles had reported his disreputable conduct. *See Wynberg v. National Enquirer, Inc.,* 564 F.Supp. 924, 928–29 (C.D.Cal.1982). By contrast, there has been no demonstration here that accusations regarding Guccione's participation in adultery were widely broadcast in any written or oral public communications, nor was the adulterous relationship

subject to any public criminal proceedings. Thus, the public reputation of Guccione was not exposed in the extensive manner as that of the plaintiffs in *Cardillo* and *Wynberg*. Obviously, the crimes involved were also of a different character. The temptation to apply a double standard to this case, however, must be avoided.

The court's indication in *Cardillo* that an action should not be permitted if a plaintiff will only recover nominal damages is difficult to reconcile in light of other rulings by the Circuit. An action for nominal damages cannot be casually discounted since it is accompanied by the vindication of a jury verdict. *See Buckley, supra,* 539 F.2d at 897; *Goldwater, supra,* 414 F.2d at 340; *Sharon v. Time,* 599 F.Supp. 538, 586 (S.D.N.Y.1984). While settlement or retraction of mistaken publications are preferable in circumstances presenting nominal harm to the plaintiff, nevertheless, the judicial process remains open to resolve these disputes between recalcitrant parties. It is presumably for the purpose of clearing the public record that libel *per se* actions are permitted as a special category of tort under New York law. Therefore, the judgment will not be vacated on the grounds that Guccione, concededly no saint, is libel proof.

■■■ The defendants also seek to align this case within the rulings in this Circuit espousing the incremental or subsidiary harm variations of the libel proof doctrine. *See Herbert v. Lando,* 781 F.2d 298 (2d Cir.1986); *Simmons Ford, Inc. v. Consumers Union of the United States, Inc.,* 516 F.Supp. 742 (S.D.N.Y.1981).

In *Herbert,* the Court of Appeals reviewed eleven allegedly libelous statements and concluded that with regard to nine of these statements there was not sufficient evidence of actual malice. While the evidence of actual malice regarding the other two statements was sufficient to survive a motion for summary judgment, the Court also directed the dismissal of the other two statements. The Court held that false statements "should not be actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary" to

statements which were not made with actual malice. *Herbert, supra,* at 312. Since the overall nonactionable charge in the article that plaintiff had lied about reporting war crimes, fully subsumed the actionable statements regarding this same issue, the Court concluded that a libel suit based on the subsidiary statements should be dismissed.

The *Simmons Ford* case involved an earlier application of this same principle. In that case, an article was published which severely criticized the performance and characteristics of an electric car. The article also falsely stated that the car was not in compliance with certain federal safety regulations. The libel action was dismissed on the basis that there was an ample basis to justify the broad conclusion asserted in the publication that the car was unacceptable and, therefore, the false statement could not have caused any incremental harm. Thus, this case stands for the proposition that when, within an otherwise nonactionable publication, the harm of a single statement is nominal or nonexistent, the statement should be dismissed as nonactionable.

The rulings in *Herbert* and *Simmons Ford* are inapplicable to the present case since there was no evidence from this publication regarding any prior publications of nonactionable charges of adultery against Guccione which would encompass the false statement at issue here. Moreover, while the *Simmons Ford* holding is premised on a finding of nominal damages, that holding does not control this action in which the false statement constituted libel *per se.* As discussed above, such actions may be maintained in spite of the nominal potential recovery.

## VI. Punitive Damages

■■■ As mentioned above, the jury awarded the minimum $1.00 in actual damages, but in addition imposed $1.6 million in punitive damages against HMI and FDC. The defendants argue that these awards of $900,000 and $600,000 respectively are unsupportable as a matter of law. The stan-

dards for awarding punitive and compensatory damages for state tort claims are provided by state law, *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 n. 5 (2d Cir.1984), while the standard for evaluating the possible excessiveness of a federal jury verdict is governed by Rule 59, Fed.R. Civ.P. *See Brink's Inc. v. City of New York*, 546 F.Supp. 403, 414 (S.D.N.Y.1982), *aff'd*, 717 F.2d 700 (2d Cir.1983).

 Under New York law, punitive damages need not be proportionally related to the actual harm suffered by the plaintiff. *Hartford Accident & Indemnity Co. v. Village of Hempstead*, 48 N.Y.2d 218, 422 N.Y.S.2d 47, 397 N.E.2d 737 (1979). *Reynolds v. Pegler*, 123 F.Supp. 36 (S.D.N. Y.1954), *aff'd*, 223 F.2d 429 (2d Cir.1955); *Toomey v. Farley*, 2 N.Y.2d 71, 156 N.Y. S.2d 840, 138 N.E.2d 221 (1956). Punitive damages are allowable in a libel suit to punish a defendant, to deter him from repeating the offense and to warn others against similar deleterious conduct. *Wachs v. Winter*, 569 F.Supp. 1438, 1445 (S.D.N.Y.1983). The financial status is relevant to the determination of how great the damages need be in order to deter further conduct, *O'Donnell v. K-Mart Corp.*, 100 A.D.2d 488, 474 N.Y.S.2d 344 (1984), and in general the award should bear some reasonable relationship to the injury inflicted and the *mala fides* of the defendant. *See Nellis v. Miller*, 477 N.Y. S.2d 72, 101 A.D.2d 1002 (1984); *Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.*, 435 N.Y.S.2d 438, 106 Misc.2d 866 (Sup.Ct. 1980).

 In reviewing a punitive award, this court must keep judgments within reasonable bounds and set aside those awards that shock the conscience of the court. *Aldrich v. Thomson McKinnon Securities, Inc.*, 756 F.2d 243 (2d Cir.1985); *Lerman v. Flynt Distributing Co.*, 745 F.2d 123 (2d Cir.1984). Courts have also demonstrated a hesitancy to uphold large punitive verdicts in libel actions in view of their potential chilling effect on free speech. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974); *Rosenbloom v. Metromedia,*

*Inc.*, 403 U.S. 29, 72–77, 91 S.Ct. 1811, 1833–36, 29 L.Ed.2d 296 (1971) (Harlan, J., dissenting); *Lerman, supra,* 745 F.2d at 141.

 With due regard for these considerations, the present judgments of $900,000 and $600,000 do not shock the conscience of the court given the evidence presented and the exercise of free speech involved. Defendants have repeatedly focused on the disparity between the actual and punitive damages in this case but ignore another basis—the *mala fides* or common law malicious intent of the defendant—which is an appropriate guideline for the award of punitive damages. *See Nellis v. Miller, supra,* 477 N.Y.S.2d at 74. The evidence regarding Flynt's extensive campaign of derogatory commentary on Guccione, and his past reckless publications amply support the substantial jury verdict. This reckless disregard for the truth is an appropriate reason for punishment and exists independent of the actual damages incurred by the plaintiff. Punishing such conduct in this unique context does not pose a threat to First Amendment values. Further the present jury award is not comparable to the mega-verdicts so common condemned on judicial review. *See, e.g., Lerman, supra,* 745 F.2d at 141 (2d Cir. 1984) ($33 million jury verdict); *Pring v. Penthouse International, Ltd.*, 695 F.2d 438 (10th Cir.1982) ($25.025 million jury verdict).

Finally, the jury verdicts are reasonably related to the wealth of the defendants. Contemporaneous tax returns demonstrated net incomes for HMI and FDC which were greater than $7 million and $8 million dollars respectively. The net worth of defendants in 1983 was also shown to be substantial. While the defendants argued that these figures were artificially inflated values, the returns provided an adequate basis for imposing the punishment determined by the jury.

## VII. Prejudicial Conduct of Counsel

 Defendants vehemently protest what they view as the prejudicial trial con-

duct of plaintiff's counsel. HMI and FDC request that both the liability and damages verdicts be set aside due to the prejudice resulting from statements made by opposing counsel.

The court is sensitive to the difficulties posed by the imposing and harsh style of plaintiff's counsel, made more strident by the absolute lack of cordiality between the parties and their frequent litigation. To correct the occasional excesses of counsel, the court cautioned against improper statements and instructed the jury to disregard incompetent or irrelevant evidence. The difficulty of attaining the proper decorum was of course also due to the often unprintable subject matter of this case.

While the relevance of the prior articles which HMI had published outweighed their prejudicial input, they nevertheless introduced pictorial and descriptive accounts of homosexual acts, sexually transmitted diseases and other graphic sexual matters. Many of the harsh statements made by plaintiff's counsel derived directly from these exceedingly unpleasant factual circumstances of the case. Therefore, it cannot be said that counsel dealt "altogether too much into matters and considerations outside the record which were obviously intended to prejudice the [defendants] in the eyes of the jury...." *Koufakis v. Carvel*, 425 F.2d 892, 904 (2d Cir.1970).

Similarly, the references by Guccione's counsel to the testimony of defense witnesses seem when taken out of context to indicate misconduct. Yet the characterization of these witnesses as liars was issued only after counsel had referred to the circumstantial evidence supporting the characterization and not simply as a technique to instill prejudice. *Cf. Koufakis, supra*, 425 F.2d at 902–03 (counsel's excessive denigration of a missing witness for his failure to take the stand); *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir.1978) (inappropriate and repeated references to defendant's wealth, plaintiff's children and other facts not in evidence). Guccione's counsel did press his case with inflammatory remarks, the most serious being his references to Flynt as the "Son of Sam among publishers" and the "Quasimodo of publishers." While these breaches were inexcusable, by the time summations were made, the jury was inured to the hyperbole and the atmosphere of hostility between former antagonists painfully sharpened by the provocative and perverse materials which were the subject of the trial—and invoked by both sides. The strong language paled by comparison to certain of the testimony. The jury was instructed appropriately that closing summaries and colloquy among counsel were not admissible evidence and that their deliberations must be impartial and without prejudice. The inflammatory language did not overbear their judgment given the totality of the trial. A new trial is not warranted.

## Conclusion

Defendants' motion for judgment n.o.v. or in the alternative for a new trial is denied.

**IT IS SO ORDERED.**